UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                          :

UNITED STATES OF AMERICA            :

                          :   Docket No.: 15-CR-116 (NGG)

      -v-                    :

                          :

TAIROD NATHAN WEBSTER PUGH   :

                          :

        Defendant.        :

                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## **TAIROD PUGH'S OMNIBUS PRETRIAL MOTIONS**

CREIZMAN PLLC
Eric M. Creizman
565 Fifth Avenue, Fl. 7
New York, New York 10017
Tel.: (212) 972-0200
Fax: (646) 200-5022
Email: ecreiz@creizmanllc.com

Attorneys for Tairod Pugh

October 22, 2015

## <u>TABLE OF CONTENTS</u>

STATEMENT OF FACTS ............................................................................................ 1

    I.       PUGH'S PERSONAL BACKGROUND ......................................................... 2

    II.     PUGH'S ARREST .................................................................................. 2

    III.    THE SEARCH WARRANTS ...................................................................... 4

          A.     The Warrant for the Electronic Devices ........................................ 4

          B.     The Warrant for Pugh's Backpacks ............................................... 7

          C.     The Warrant for Pugh's Facebook Account ................................... 8

ARGUMENT .............................................................................................................. 9

    I.       COUNT ONE OF THE INDICTMENT SHOULD BE DISMISSED FOR FAILURE TO STATE AN ESSENTIAL ELEMENT OF THE OFFENSE. .................................... 10

          A.     An indictment is insufficient unless it alleges all essential elements of the offense.............................................................................. 10

          B.     The Definition of "Personnel" under Section 2339B(h) is an essential element of the offense. ............................................... 11

          C.     Count One of the Indictment is facially insufficient and should be dismissed.................................................................................. 16

    II.     COUNT TWO OF THE INDICTMENT SHOULD BE DISMISSED. ......................... 16

          A.     Count Two of the Indictment should be dismissed based on insufficiency of the evidence. ................................................... 16

          B.     Count Two should be dismissed because it is duplicitous. ........... 18

    III.    THE FRUITS OF THE SEARCH WARRANTS ISSUED IN THIS CASE SHOULD BE SUPPRESSED. ...................................................................................... 19

          A.     The Electronic Devices Warrant lacks particularity and is overbroad. ............................................................................... 22

          B.     Any items obtained from the execution of the Backpack Warrant should be suppressed.................................................................. 24

          C.     The Facebook Warrant lacks particularity and is overbroad. ....... 25

IV.    PUGH IS ENTITLED TO A BILL OF PARTICULARS SPECIFYING THE ACTIVITIES THE GOVERNMENT CONTENDS CONSTITUTE THE MATERIAL SUPPORT AND RESOURCES PUGH ATTEMPTED TO PROVIDE. ........................................................... 27

V.    THE GOVERNMENT SHOULD BE DIRECTED IMMEDIATELY TO PRODUCE *BRADY/GIGLIO* MATERIAL. ..................................................................................... 29

VI.    THE GOVERNMENT SHOULD BE ORDERED TO PROVIDE EARLY DISCLOSURE OF 404(B) EVIDENCE. ................................................................................................. 30

CONCLUSION ............................................................................................................ 32

Tairod Pugh respectfully submits this memorandum of law in support of his omnibus pre-trial motions: (i) to dismiss Count One of the Indictment based on facial insufficiency; (ii) to dismiss Count Two of the Indictment for failure to state an offense and because it is duplicitous; (iii) to suppress materials and information obtained from the search warrants issued and executed in this case; (iv) for a bill of particulars; (v) for immediate production of *Brady* and *Giglio* material, and (vi) for early pretrial disclosure of other act evidence under FRE 404(b).

## STATEMENT OF FACTS

Pugh is charged in a two-count indictment that was filed on March 16, 2015.  Count One alleges that Pugh, between May 2014 and January 2015, attempted "to provide material support and resources, including personnel," to the Islamic State of Iraq and the Levant, also known as "ISIL" or "ISIS," knowing that ISIS was a designated terrorist organization, that had engaged in or was engaging in terrorist activity and terrorism, in violation of 18 U.S.C. § 2239B(a)(1).[1]

Count Two alleges that between January 10, 2015 and January 16, 2015, Pugh obstructed and attempted to obstruct an official proceeding, to wit, a federal grand jury investigation in the Eastern District of New York "relating to the commission and possible commission of one or more terrorism offenses, including the offense charged in Count One" (the "Grand Jury Terrorism Investigation").  According to the Indictment, Pugh destroyed four thumb drives and the files they contained with the "intent to impair such items' integrity and availability" for use in the Grand Jury Terrorism Investigation and "to obstruct, influence and impede" the Grand Jury Terrorism Investigation.

---

[1] The Indictment is annexed to the accompanying Declaration of Eric Creizman ("Creizman Decl.") as Exhibit A.

## I. Pugh's Personal Background

Pugh is a United States citizen who served in the U.S. Air Force from 1986 to 1990 as an avionics instrument system specialist. (Complaint ¶¶ 6, 7).[2]  While in the Air Force, Pugh received training in the installation and maintenance of aircraft engine, navigation, and weapons systems. (*Id.* ¶ 7). The Complaint alleges that after moving to San Antonio, Texas in 1998, Pugh converted to Islam and, without attributing the basis for this information, purportedly "became increasingly radical in his beliefs." (*Id.*). In 2001, Pugh worked as a mechanic for American Airlines, where an unidentified co-worker tipped the FBI that "Pugh sympathized with Osama bin Laden, felt that the 1998 bombings of the U.S. embassies overseas were justified, and expressed anti-American sentiment." (*Id.* ¶ 8).

In 2002, an unidentified "associate" of Pugh's told the FBI that Pugh "had expressed an interest in traveling to Chechnya to fight Jihad." (*Id.* ¶ 9). From October 2009 through March 2010, Pugh worked on aircraft avionics in Iraq as an army contractor for DynCorp. (*Id.* ¶ 10). During 2013 and 2014, Pugh worked in the Middle East as an avionics specialist and airplane mechanic. (*Id.* ¶ 12; Gov't Pre-Arraignment Ltr. 3/17/15 at 2). In December 2014, Pugh was fired from his airplane mechanic job in Kuwait. (Gov't Ltr. 3/17/15 at 2).

## II. Pugh's Arrest

On January 10, 2015, after flying from Egypt to Istanbul, Pugh was stopped for questioning by Turkish Authorities at Ataturk Airport. (Complaint ¶ 13). Pugh allegedly told authorities that he was a pilot in the U.S. Special Forces and that he was visiting Turkey for vacation. (*Id.*). Pugh also declined to consent to a request to search his laptop, and Turkish authorities then denied Mr. Pugh entry into Turkey and placed him on a return flight to Cairo.

---

[2] The Complaint is annexed to the Creizman Declaration as Exhibit B.

(*Id.*)  Upon arrival to Cairo later that evening, Pugh was detained by Egyptian authorities. (*Id.* ¶ 14).  In response to questioning, Pugh told Egyptian authorities that he had traveled to Turkey to look for a job because he had been unable to find work in Egypt.  (*Id.*).  He also denied that he had any desire to travel to Syria.  (*Id.*).

Egyptian authorities found various electronic media devices in Pugh's possession, including a laptop, two cell phones, an iPod, and five USB thumb drives.  (*Id.* ¶ 15).  Upon inspecting the devices, they determined that Pugh's laptop was water damaged and inoperable, the iPod appeared to have been wiped clean of data, and "many of the USB thumb drives appeared damaged and were missing their outer casings."  (*Id.* ¶ 15).  Pugh provided the authorities with his password for one of his cell phones, which contained photographs of a machine gun, airplanes, an airplane toilet, and the area under the airline seats, where passengers typically stow carry-on luggage.  (*Id.* ¶ 16).  In response to questioning, Pugh said that he had a picture of the machine gun because he liked the photograph.  (*Id.*).  The Egyptian authorities informed Pugh that the was likely to be deported to the United States.  (*Id.* ¶ 18).  Pugh responded that he preferred to remain in Egyptian custody or to be sent anywhere else in the Middle East rather than return to the United States.  (*Id.* ¶¶ 18-19).

Egyptian authorities put Pugh on a flight to the U.S., which arrived at LaGuardia or JFK Airport on January 15, 2015.  (*Id.* ¶ 29).[3]  An undercover government agent approached Pugh and "struck up a conversation" with him.  (*Id.*).  According to the agent, Pugh discussed his

---

[3] According to the FBI 302 memorandum of the conversation between the undercover agent and Pugh at the airport, Pugh arrived at LaGuardia Airport.  In subsequent search warrant applications, the affidavits state that the conversation between the undercover agent and Pugh occurred at JFK Airport.

experience of being denied entry to Turkey and his subsequent detention in Egypt.  (*Id.*).  Among

other things, according to the agent, Pugh also disclosed that:

> •  he told Egyptian authorities that he wanted to go anywhere but the U.S.;
>
> •  he had expected to be arrested upon his arrival in New York;
>
> •  he had recently married an Egyptian woman who "originally wanted to move to the US with him";
>
> •  he historically worked as an airplane technician, including in the Middle East, and that he gained his experience from his service in the U.S. Air Force;
>
> •  he doesn't talk on phones because it's not safe;
>
> •  he had traveled to Turkey to gain access to the Islamic State; and,
>
> •  he should have shaved his beard and changed into pants before trying to enter Turkey in order to have avoided drawing suspicion.

(*Id.*).  Although the government has provided an original and an enhanced version of what it

describes as the recording of the airport conversation, the audio quality on both versions is poor.

The recordings are almost completely unintelligible and inaudible.

On January 16, 2015, Pugh was arrested on the Complaint in Asbury Park, New Jersey.

### III.   The Search Warrants

#### A.  The Warrant for the Electronic Devices

On January 11, 2015, the FBI obtained the electronic devices—the laptop, two cell

phones, five thumb drives, and an iPod—seized by the Egyptian authorities upon Pugh's arrival

in Cairo the night before.  (Complaint ¶ 20).  The electronic devices were transported to the

United States, where they remained in FBI custody.  (*Id.*).  While Pugh was in the custody of

Egyptian law enforcement, and a day before Pugh's travel from Egypt to the United States, the

government obtained a search warrant, dated January 14, 2015, with respect to the damaged

electronic devices that were in the possession of the FBI.  (Creizman Decl. Ex. C).

4

The face of the warrant authorizes the search of the electronic devices for categories of items as specified in Attachment B, "all of which constitute evidence of providing or conspiring to provide material support for terrorist activity, in violation of Title 18, United States Code, Section 2339A." (*Id.*).  Thus, although the Indictment charges Pugh with violation of 18 U.S.C. § 2339<u>B</u>, which prohibits providing, or conspiring or attempting to provide, material support or resources to a foreign terrorist organization, the warrant authorizes a search for evidence of Section 2339<u>A</u>, which prohibits providing, or attempting or conspiring to provide, material support or resources knowing or intending that they be used in carrying out a crime of terrorism.

Furthermore, the face of the warrant has a line striking through language that authorizes the search for materials relating to the destruction of evidence in furtherance of an obstruction charge.  Thus, it appears that Magistrate Judge Orenstein, who signed the warrant, specifically declined the government's application for authorization to search for evidence relating to an obstruction charge (likely because the materials were destroyed well before Pugh could possibly have been aware that the materials were relevant to a grand jury investigation, *see infra* at Argument § II).

Notwithstanding the apparent limitations on the face of the warrant, Attachment B lists 14 broad categories of information that, for all intents and purposes, permit an unlimited search of the devices.[4]  Furthermore, the language relating to evidence of obstruction of justice is not stricken in Attachment B as it is on the face of the warrant, and thus includes a category of "Records or information reflecting efforts to destroy or conceal evidence contained on the Media Devices."

---

[4] One of those categories is effectively a "catch-all," permitting a search for "[c]ontextual information necessary to understand the evidence described in this attachment."

The affidavit in support of the warrant relies principally on: (i) Pugh's purported statement to Turkish officials that he was a pilot with the U.S. Special Forces; (ii) Pugh's apparent attempt to destroy the electronic devices and the data contained on them; (iii) photographs of a machine gun, and of airplanes, the airplane toilet, and areas under the airline seats; (iv) statements by others that Pugh supported radical Islam and posts on his "private Facebook page" of radical Islamic propaganda; and the (v) general experience of the agent with terrorism cases (Creizman Decl. Ex. D ¶¶ 4, 6-7, 15-20, 26-30).

The search of the electronic devices yielded, among other things, (i) the discovery that internal memory chips had been removed from four of the five damaged thumb drives; (ii) an email from Pugh to an acquaintance, dated December 11, 2014, that he had been fired from his job; (iii) approximately 180 radical Islamist propaganda videos downloaded between September 22, 2014 and December 18, 2014; (iv) a chart of crossing points between Turkey and Syria, dated December 12, 2014, showing whether the checkpoints are manned by Turkish authorities, and showing the particular groups, including ISIL, who control the inner areas of the Turkish-Syrian border within Syria; and (v) a draft letter from Pugh to his wife, drafted between January 3 and January 5, 2015, stating that:

> I am a Mujahid. I am a sword against the oppressor and a shield for the oppressed. I will use the talents and skills given to me by Allah to establish and defend the Islamic States. There is only 2 possible outcomes for me. Victory and Martyr. If Allah gives us Victory we will have a home in Al-sham. I will send for you when it is safe. You will have a nice home around believers. If I am made a martyr we will have a mansion of indescribable beauty on a magnificent plot of land. The land under a whip is worth more than the world and all it contains.
>
> I calculated my worth in Dunya. I would usually sell myself for $1,000 dollars a week, that would be ½ a million dollars for 10 years. If I sell myself to Allah: 1 night guarding the borders for the sake of Allah is worth more than the world and all it contains.

6

(Creizman Decl. Ex. E ¶¶ 16-20).  Lab reports produced in discovery also provided evidence that the electronic devices were intentionally damaged.

Notably, the search of the electronic devices yielded no evidence whatsoever of: (i) any communications between Pugh and any member or representative of any terrorist organization; (ii) any materials suggesting that Pugh was planning to undertake any terrorist act; (iii) any records showing any financial transactions with foreign terrorist organizations; or (iv) any weapons training.  (Creizman Decl. Ex. D, Attachment B).

### B.  The Warrant for Pugh's Backpacks

Pugh was not arrested when he arrived at the airport in New York on January 15, 2015. After Pugh had a conversation with the undercover agent, he left the airport and went to New Jersey to stay with his family.  Agents did not arrest Pugh or seize his possessions at the airport (or in Egypt, for that matter) in order "to avoid arousing Pugh's suspicion that he was under investigation by U.S. authorities."  (Creizman Decl. Ex. F ¶ 15).  Pugh left the airport with two backpacks.  From the time Pugh arrived in New York until he was arrested the following day on January 16, 2015, "agents kept Pugh under continual surveillance."  (*Id.* ¶ 30).  When Pugh was arrested, he had one of the backpacks in his possession, and that backpack was seized by the agents.  (*Id.* 26).  The agents conducted an inventory search of that backpack and found that it "principally contained clothing, a hydration pouch, loose paper, and a book that [Pugh] referred to as a Qur'an."  (*Id.*).  On January 17, 2015, the day after Pugh's arrest, the agents met with Pugh's father, who gave them the other backpack, which he said Pugh left at his house.  (*Id.* ¶ 27).  The agents did not conduct an inventory search of that backpack.  (*Id.*).  Both of Pugh's backpacks were stored in FBI custody, and the government applied for, and obtained a warrant to search the backpacks on January 21, 2015.  (Creizman Decl. Exs. E, F).

The information relied upon to support the warrant is similar to that cited in support of the previous warrant to search the electronic devices, and also includes the evidence obtained from the search of the electronic devices.  (Creizman Decl. Ex. F ¶¶ 4-22).  The application for the warrant states that a search would possibly yield "camping gear, clothing and footwear suitable for the outdoors as well as travel documents," the missing memory chips from one or more of the four damaged thumb drives, a notebook an investigator observed Pugh writing in on Pugh's flight from Egypt to New York, and other evidence relating to a violation—this time, not of Section 2339A, but of Section 2339B, providing material support or resources to a foreign terrorist organization, the offense with which Pugh is charged in this case.  (*Id.* ¶¶ 22-24, 29).  The warrant itself does not particularize the items in the backpack to search for and seize and does not incorporate the warrant affidavit by reference.  (Creizman Decl. Ex. E).

### C.  The Warrant for Pugh's Facebook Account

On February 17, 2015, the government applied for and obtained a search warrant for Pugh's Facebook account.  (Creizman Decl. Exs. G, H).  The warrant requires Facebook to disclose to the government a broad array of information, including: (i) all identity, profile, and contact information of Pugh's account; (ii) all IP logs relating to each login to the account; (iii) all activity logs for the account showing Pugh's posts and other Facebook activities; (iv) all information about Pugh's "friends" and any posts referencing Pugh or his posts; (v) all privacy and account settings; (vi) all data and information accessed and deleted by Pugh; (vii) all past and present lists of friends created by Pugh's account; all records of Pugh's Facebook searches; (viii) all information about Pugh's use of Facebook Marketplace; (ix) the length of service for Pugh's account, types of service, and means and source of any payments associated with the service of the account; and (x) all records pertaining to communications between Pugh and other

Facebook users, between Pugh and Facebook, and between Facebook and any users concerning

Pugh's account.  (Creizman Decl. Ex. G, Attachment B).

The warrant permits the government to seize "[a]ll information . . . that constitutes fruits,

evidence, and instrumentalities of violations of Section 2339B," including, "by way of example

only": (i) communications and photographs concerning the use and procurement of explosive

and other weapons; (ii) communications and photographs concerning the transportation, safe-

housing and activities of terrorist operatives; (iii) communications concerning terrorist financing,

the location of terrorist groups, and/or methods of traveling to join designated foreign terrorist

organizations; and (iv) records relating to who created, used, or communicated with Pugh's

account, including records about their identities or whereabouts.  (*Id.*).  Notably, the search

warrant does not contain a search protocol requiring the government to use computer search

methodology to avoid searching files and other information not identified in the warrant.  Nor

does the warrant incorporate the search warrant affidavit by reference.  (*Id.*).

The warrant affidavit supports the application by referring to essentially the same

information in the previous affidavits (Creizman Decl. Ex. H ¶¶ 6-26), as well as a more detailed

description of Pugh's meeting with the undercover agent at the New York airport (stating that

Pugh "appeared pleased" when he looked at the undercover's Facebook page, which showed the

ISIL flag as a banner (*Id.* ¶ 27)).  The warrant affidavit also described in detail publicly-

accessible posts of radical Islamic propaganda that appeared on Pugh's Facebook page.

## **ARGUMENT**

For the reasons set forth below, we respectfully request that the Court grant Pugh's

motions for an order: (i) dismissing Count One of the Indictment for facial insufficiency; (ii)

dismissing Count Two of the Indictment for failure to state an offense and because it is

duplicitous; (iii) suppressing evidence obtained from the three search warrants issued in this

case; (iv) requiring the government to provide a bill of particulars; (v) requiring the government to immediately produce any *Brady* or *Giglio* material; and (vi) directing the government to provide early notice of 404(b) evidence.

**I.  Count One of the Indictment should be dismissed for failure to state an essential element of the offense.**

**A.  An indictment is insufficient unless it alleges all essential elements of the offense.**

Rule 7 of the Federal Rules of Criminal Procedure requires that "[t]he indictment . . . shall be a plain, concise and definite written statements of the essential elements of facts charged." Fed. R. Crim. P. 7(c)(1). A criminal indictment is legally sufficient on its face "if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). An indictment that fails to allege the essential elements of the crime charged offends both the Fifth and Sixth Amendments. *See United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000).

Of course, it is well established that this Circuit has "consistently upheld indictments that do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999) (quotation and citation omitted). Nevertheless, it has also long been the rule in this Circuit that a bare citation of the statute, without more, is facially deficient where the factual allegations of essential elements of the offense are missing. *See, e.g., United States v. Gonzalez*, 686 F.3d 122, 128 (2d Cir. 2012) ("In sum, stating that an act is in violation of a cited statutory section adds no factual information as to the act itself. It declares the legal basis for claiming that the act is deserving of punishment, but does nothing to describe the act.").

A defendant is entitled to an indictment that does more than include a bare citation of the statutory section in order to determine whether "the grand jury considered [the] . . . essential element." *Id.* "In sum, for an indictment to fulfill the functions of notifying the defendant of the charges against him and of assuring that he is tried on the matters considered by the grand jury, the indictment must state some fact specific enough to describe a particular criminal act, rather than a type of crime." *United States v. Pirro*, 212 F.2d 86, 93 (2d Cir. 2000).  Thus, "for certain statutes specification of how a particular element of a criminal charge will be met . . . is of such importance to the fairness of the proceeding that it must be spelled out in the indictment." *United States v. Stringer*, 730 F.3d 120, 126 (2d Cir. 2013).

### B.  The Definition of "Personnel" under Section 2339B(h) is an essential element of the offense.

Section 2339B makes it unlawful to "provide[] material support or resources to a foreign terrorist organization, or attempt[] or conspire[] to do so…."  18 U.S.C. § 2339B(a)(1).  In 2004, Congress passed the Intelligence Reform and Terrorism Prevention Act ("IRTPA"), which amended Section 2339B in several key ways, including the concept of material support in the form of "personnel."  Specifically, to address vagueness and overbreadth challenges to the statute, the IRTPA added subsection (h) to Section 2339B.  Section 2339B(h) circumscribes the prohibition on providing "personnel" to a foreign terrorist organization, by making the provision of "personnel" an offense only where a person provides, or attempts or conspires to provide, "1 or more individuals (who may be or include herself), to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization."  18 U.S.C. § 2339B(h).  In addition, under Section 2339B(h), the criminal prohibition on providing "personnel" does not include conduct of "[i]ndividuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives."  *Id.*

11

Concededly, as a general rule, a statutorily-created exception to a criminal offense is not considered an essential element of that offense, but rather an affirmative defense available to the defendant. *See, McKelvey v. United States*, 260 U.S. 353, 357 (1922) ("[A]n indictment . . . founded on a general provision defining the element of an offense . . . need not negative the matter of an exception made by a proviso or other distinct clause, whether in the same section or elsewhere, and that it is incumbent on one who relies on such an exception to set it up and establish it.").  In some cases, however, the exceptions contained within the enumerated offense are inseparable from the enunciated rule, and thus the failure to negate the exception renders the indictment insufficient. *See, e.g., United States v. Bel-Mar Labs. Inc.*, 284 F. Supp. 875, 885 (E.D.N.Y. 1968) (statutorily-created exceptions can be "so inseparable from the definitions of the offenses that their essential elements cannot accurately be described if the [exception] is omitted"); *United States v. Pope*, 189 F. Supp. 12, 18 (S.D.N.Y. 1960) ("The rule is that an indictment need not negative a statutory exception unless the exception is so inseparable from a true definition of the offense that the ingredients of the offense cannot accurately be described if the exception is omitted."); *United States v. Bailey*, 277 F.2d 560, 562-564 (5th Cir. 1960) (reversing conviction on count charging violation of a statute prohibiting transacting in narcotic drugs except "in the original stamped package," where the indictment failed to negative the exception "in the original stamped package," and thus failed to state an offense).

In evaluating whether an exception to a statute should be construed as an essential element of the offense as opposed to an affirmative defense, courts have undertaken a three-step analysis. *See, e.g., United States v. Kloess*, 251 F.3d 941, 944 (11th Cir. 2001).  First, the court examines the language and structure of the statute itself. *Id.*  Second, the court reviews the legislative history to determine whether Congress intended to make the exception an element of

12

the offense. *Id.* Third, the court assesses whether the government "is well-situated to adduce evidence tending to prove the applicability of the exception." *Id.*

An application of the three-step analysis here demonstrates that an essential element of the offense is that the the "personnel" supplied work under the direction of or direct the activities of the foreign terrorist organization as set forth in Section 2339B(h). *First*, the language and structure of the statute supports a conclusion that the definition of "personnel" in Section 2339B(h) is an essential element of the offense set forth in Section 2339B(a). To begin with, a statutory exception set forth in subsequent clause may be "clothed in such language . . . to define the offence [] that it would be impossible to frame the actual statutory charge in the form of an indictment with accuracy, and the required certainty, without an allegation showing that the accused was not within the exception contained in the subsequent clause, section, or statute." *United States v. Cook*, 84 U.S. 168, 173-174 (1872). In other words, as the Eleventh Circuit observed, in determining whether a statutory exception is an essential element of the offense or an affirmative defense, a court should consider whether "one can omit the exception from the statute without doing violence to the definition of the offense." *United States v. McArthur*, 108 F.3d 1350, 1353 (11th Cir. 1997).

Here, the elements of Section 2339B(a)(1) cannot be accurately and clearly described if Section 2339B(h) is omitted. Indeed, the language of Section 2339B(h) is not even phrased as an exception, but as an affirmative requirement of the government's proof:

> No person may be prosecuted under this section in connection with the term "personnel" unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization.

18 U.S.C. § 2339B(h).  Furthermore, the detailed definition of "personnel" in Section 2339B(h) was added only to Section 2339B and not to Section 2339A—which also criminalizes the provision of material support or resources in the form of "personnel" (18 U.S.C. § 2339A(a), (b)(1)).  The fact that Congress chose not to apply the more detailed definition to Section 2339A demonstrates that the definition of "personnel" that Congress provided for in amending Section 2339B is an integral component of an offense charged under Section 2339B(a)(1).  *See, e.g., United States v. Stewart*, 590 F.3d 93, 118, n.21 (2d Cir. 2009) (observing that the IRTPA defined "personnel" "in more detail for purposes of Section 2339B," and that "[t]his amended definition applies to Section 2339B, but not to Section 2339A").

*Second*, the legislative history of the IRTPA states that the detailed definition of "personnel" added to Section 2339B in 2004 was an effort to clarify and narrow the definition of that and other terms in the statute.  *See, e.g.,* H.R. Rep. No. 108-724, at 224 (2004), 2004 WL 2282343 (stating that the Act "more clearly defines the term material support"); *Three Years After September 11: Keeping America Safe*, March 2004 Report submitted by Majority and Minority Staff of United States Senate Committee on the Judiciary Subcommittee on Terrorism, Technology, and Homeland Security at 109 (the Act "amends current law by *defining the knowledge required to violate the statute*, more specifically defining 'personnel,' 'training,' and 'expert advice,' and specifying that nothing contained in this statute shall be construed to abridge free speech rights") (emphasis added).  Indeed, the amendment was designed to address the vagueness and overbreadth concerns raised by civil liberties and privacy groups.  Thus, the amendment ensured that the definition of "personnel" "provide[s] a person of ordinary intelligence fair notice of what is prohibited.  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010) ("*HLP*").

14

In *HLP*, the Supreme Court observed that Congress's "narrowing definitions to the material-support statute over time . . . increased the clarity of the statute's terms," and specifically, that the narrowed definition of "personnel"—to those working under the terrorist organization's direction or control, rather than independently—adequately addressed vagueness concerns.  *Id.* at 23.  *See also, United States v. Farhane*, 634 F.3d 127, 140 (2d Cir. 2011) (observing, in rejecting defendant's vagueness challenge to Section 2339B, that the "narrowing definitions" of terms, including "personnel," "increased the[ir] clarity," as well as in the knowledge element required for a § 2339B conviction) (*citing HLN*); *see also Id.* at 141-142.

*Third*, the government is well-suited to adduce the evidence tending to prove the applicability of the exception, *i.e.*, whether the defendant provided or attempted to provide personnel to "work under" the "direction or control" of a terrorist organization.  For example, in *Farhane*, the Second Circuit affirmed a conviction under Section 2339B, stating that the government was obligated to offer, and did introduce sufficient proof that the defendant pledged more than "mere membership" in Al Qaeda:

> Sabir's purpose in swearing *bayat* was to formalize his promise to work as a doctor under the organization's direction and control.  That is most certainly evidence of a crime; the charged crime of attempting to provide material support to terrorism in the form of personnel.  *See* 18 U.S.C. § 2339(h) (*clarifying* that what is proscribed is the provision of personnel "to work under" the "direction or control" of a terrorist organization). . . .  Sabir crossed the line from simply professing radical beliefs or joining a radical organization to attempting a crime, specifically, Sabir's provision of himself as personnel *to work under the direction and control of Al Qaeda.*

*Farhane*, 634 F.3d at 150 (emphasis added).

Based on the three-step analysis described above—(1) the language and structure of the statute itself; (2) the legislative history; and (3) whether the government is well-suited to adduce the evidence proving the applicability of Section 2339B(h)—the prohibition of providing

personnel *to work under the direction and control* of a foreign terrorist organization is an essential element of Section 2339A.

### C.  Count One of the Indictment is facially insufficient and should be dismissed.

Count One of the Indictment does not allege that Pugh attempted to act at the direction or under the control of ISIL, or with a view of organizing or directing ISIL's activities himself. Accordingly, Count One is facially insufficient and should be dismissed.

## II.  Count Two of the Indictment should be dismissed.

### A.  Count Two of the Indictment should be dismissed based on insufficiency of the evidence.

We recognize that a defendant may not contest the sufficiency of the government's proof in a pretrial motion "unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial."  *United States v. Urso*, 369 F.Supp.2d 254, 259 (E.D.N.Y. 2005) (Garaufis, J.) (*citing United States v Alfonso*, 143 F.3d 772, 776-777 (2d Cir. 1998)).  Here, however, the allegations of the Complaint and the search warrant affidavits proffer all the evidence relevant to the obstruction of justice charge in Count Two, and demonstrate that Pugh could not possibly have had the requisite *mens rea* to violate either of the statutes identified in that Count.  The obstruction charge is based on Pugh's alleged destruction of four thumb drives, with the "intent to impair such items' integrity and availability" for use in an official proceeding, namely the Grand Jury Terrorism Investigation, and "to obstruct, influence and impede" the Grand Jury Terrorism Investigation.  (Creizman Decl. Ex. A).

To satisfy the element of intent under the obstruction statutes charged in Count Two—18 U.S.C. § 1512(c)(1) and 1512(c)(2)—the official proceeding must have been foreseeable to Mr. Pugh at the time of his allegedly obstructive act. *See Arthur Andersen LLP v. United States*, 544 U.S. 696, 707-08 (2005); *United States v. Aguilar*, 515 U.S. 593, 599-600 (1995); *United Sates v.*

*Reich*, 479 F.3d 179, 185 (2d Cir. 2007).  Furthermore, the element of intent incorporates a "nexus requirement," whereby Mr. Pugh's alleged conduct must have "a relationship in time, causation, or logic with the judicial proceedings." *United Sates v. Reich*, 479 F.3d 179, 185. Put another way, his action "must have the natural and probable effect of interfering with the due administration of justice." *Id.*

The Complaint alleges that Pugh destroyed his hard drives sometime between being denied entry into Turkey at Atatürk Airport and his arrival in Egypt, where the Egyptian authorities discovered and seized the damaged thumb drives.  (Creizman Decl. Ex. B ¶ 13).  Each of the search warrant affidavits submitted in this case confirm the Complaint's allegations that the thumb drives were destroyed *before* he was detained by the Egyptian authorities.  (Creizman Decl. Exs. D ¶ 6; F ¶¶ 13, 15; H ¶¶ 16, 18).  Thus, at the time he allegedly destroyed the thumb drives, Pugh was unaware of any U.S. investigation or proceeding.  It was only *after* Pugh was detained by the Egyptian authorities (when the thumb drives had already been damaged) that Pugh was advised of the possibility that he could be deported to the United States.

At the same time, the prosecution team here took active steps to ensure that Pugh did not suspect that he was being investigated by the United States.  Indeed, according to the search warrant affidavit in support of Pugh's backpacks, Pugh's possessions were neither seized in Egypt nor in the New York airport, nor was he arrested in New York, in order "to avoid arousing Pugh's suspicion that he was under investigation by U.S. authorities."  (Creizman Decl. Ex. F ¶ 15).  In these circumstances, there plainly was no nexus between Pugh's alleged act and the official proceeding because there was no relationship in time, causation or logic between the two. Pugh had no way of knowing or foreseeing that his action could have the effect of obstructing an ongoing official proceeding in New York or anywhere else in the United States.

17

These salient facts likely explain why Magistrate Judge Orenstein struck the language from the face of the initial warrant permitting the search and seizure of materials relating to the "destruction of evidence . . . in violation of 18, United States Code, Section 1519" (Creizman Decl. Ex. C):  because the evidence clearly established that Pugh could not possibly have had the requisite intent to commit obstruction of justice under U.S. law.

Accordingly, the Court should dismiss Count Two of the Indictment.

**B.  Count Two should be dismissed because it is duplicitous.**

Count Two should be dismissed on the separate and independent ground that it is duplicitous.  "Duplicity" is the joining together in a single count of two or more distinct and separate offenses.  *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992).  An indictment is impermissibly duplicitous where: (i) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be a "separate count for each offense," and (ii) the defendant is thereby prejudiced.  *See United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001).  A duplicitous indictment gives a defendant improper notice of the charges against him or her, prejudices a defendant from an evidentiary and sentencing standpoint, exposes the defendant to the risk that a conviction may result from a less-than-unanimous verdict, and increases the likelihood of double jeopardy in a subsequent prosecution.  *See, e.g., Aracri*, 968 F.2d at 1518; *United States v. Hughes*, 310 F.3d 557, 560 (7th Cir. 2002).

Here, Count Two charges obstruction of justice based on two separate statutes, 18 U.S.C. Sections 1512 (c)(1) and (c)(2), each requiring proof of an element that the other does not. Section 1512(c)(1) criminalizes "corruptly alter[ing], destroy[ing], mutilate[ing], or conceal[ing] a record, document, or other object, or attempt[ing] to do so, with the intent to impair the object's integrity or availability for use in an official proceeding." 18 U.S.C. § 1512(c)(1).  Thus, in order to prove a violation of Section 1512(c)(1), the government must prove: (i) that a

18

defendant altered, destroyed, or concealed a document, or attempted to do so, (ii) with intent to impair the document's availability for use in an official proceeding. *See United States v. Jahedi*, 681 F.Supp.2d 430, 434-35 (S.D.N.Y. 2009).

By contrast, Section 1512(c)(2) subjects to criminal liability a person who intentionally "obstructs, influences or impedes any official proceeding, or attempts to do so." 18 U.S.C. § 1512(c)(2), but it does not require proof of the destruction of a record, as is required by Section 15(c)(1). Similarly, Section 1512(c)(1) does not require that the defendant intentionally obstruct, influence, or impede any official proceeding, but only that the destruction of the record was intended to impair that record's availability for the official proceeding.

Accordingly, Count Two is duplicitous and should be dismissed. *See, e.g.*, *United States v. Savoires*, 430 F.3d 376, 378-381 (6th Cir. 2005) (count duplicitous where it charged two separate provisions under 18 U.S.C. § 924(c): (1) using or carrying a firearm during and in relation to a drug trafficking crime, and (2) possessing a firearm in furtherance of a drug trafficking crime); *United States v. Gibson*, 310 F.2d 79 (2d Cir. 1962) (count duplicitous where it charged the two offenses of failing to register and pay a special tax to import and deal in marijuana and of selling illegally imported narcotics known to have been illegally imported); *United States v. Narcia*, 776 F. Supp. 491 (D. Ariz. 1991) (premeditated murder, felony-murder committed during perpetration of a burglary, and felony-murder committed during attempt to perpetrate robbery were required to be charged in separate counts because they were separate offenses created in a single statutory section).

## III.   The fruits of the search warrants issued in this case should be suppressed.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Thus, the Warrants Clause both

19

"requires particularity and forbids overbreadth." *United States v. Cioffi*, 668 F. sup. 2d 385, 390 (E.D.N.Y. 2009).   "Although somewhat similar in focus, these are two distinct legal issues: (1) whether the items listed as 'to be seized' in the warrant were overbroad because they lacked probable cause; (2) whether the warrant was sufficiently particularized on its face to provide the necessary guidelines for the search by the executing officers." *United States v. Hernandez*, 2010 WL 26544, at *7 (S.D.N.Y. Jan. 6, 2010) (citations omitted).

The overbreadth inquiry asks "whether the warrant authorized the search and seizure of items as to which there is no probable cause." *United States v. Dupree*, 781 F.Supp. 2d 115, 148 n.14 (E.D.N.Y. 2011) (quotations omitted).   Thus, a warrant is overbroad if its "description of the objects to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based." *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013).

The particularity requirement has three components.   *First*, "a warrant must identify the specific offense for which the police have established probable cause." *Galpin*, 720 F.3d at 445 (citations and quotations omitted).   *Second*, "a warrant must describe the place to be searched." *Id.* at 445-446.   *Third*, a "warrant must specify the 'items to be seized by their relation to designated crimes." *Id.* at 446.

The core purposes of the particularity requirement are "preventing general searches, preventing the seizure of objects upon the mistaken assumption that they fall within the magistrate's authorization, and preventing the issuance of warrants without a substantial factual basis." *United States v. Young*, 745 F.2d 733, 759 (2d Cir. 1984).   The particularity requirement thus serves to protect personal privacy by barring law enforcement from conducting "a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971); *see also, United States v. George*, 975 F.2d 72, 74 (2d Cir. 1992) ("Because

everyone has some kind of secret or other . . . permitting police agents to ransack one's personal belongings has long been considered abhorrent to fundamental notions of privacy and liberty.")

Where, as here, warrants authorize the search of computer hard drives, various data storage devices, and other electronic media, "the particularity requirement assumes even greater importance." *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013). As the *Galpin* court observed,

> [t]he potential for privacy violations occasioned by an unbridled, exploratory search of a hard drive is enormous. This threat is compounded by the nature of digital storage. Where a warrant authorizes the search of a residence, the physical dimensions of the evidence sought will naturally impose limitations on where an officer may pry: an officer could not properly look for a stolen flat-screen television by rummaging through the suspect's medicine cabinet, nor search for false tax documents by viewing the suspect's home video collection. Such limitations are largely absent in the digital realm, where the size or other outwardly visible characteristics of a file may disclose nothing about its content.

*Id.* at 447.

Thus, because there is currently no way to ascertain the content of a file without opening it and because files containing evidence of a crime may be intermingled with millions of innocuous files, "[b]y necessity, government efforts to locate particular files will require examining a great many other files to exclude the possibility that the sought-after data are concealed there." *Id.* (*quoting United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1176 (9th Cir. 2010). Consequently, once the government has obtained authorization to search a hard drive, the government may claim that every file it chose to open was in plain view, thus raising "a serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant." *Id.* (*quoting Comprehensive Drug Testing*, 621 F.3d at 1176. Accordingly, "[t]his threat demands a heightened sensitivity to the particularity requirement in the context of digital searches." *Id.*

Here each of the three warrants issued in this case suffers from deficits of Constitutional dimension that require the suppression of materials yielded from their executions.

### A.  The Electronic Devices Warrant lacks particularity and is overbroad.

The January 14, 2015 warrant authorizing the searches of five thumb drives, a laptop computer, and two cell phones (the "Electronic Devices Warrant") violates the Fourth Amendment because it suffers from both lack of particularity and overbreadth.  *See* Creizman Decl. Ex. C.  As an initial matter, the Electronic Devices Warrant specifies the sole offense under investigation: Section 2339A, which criminalizes providing material support or resources for the purpose of carrying out a crime of terrorism.  18 U.S.C. § 2339A.  *Id.*  The line striking out the offense of obstruction indicates that Magistrate Judge Orenstein did not find probable cause to search for evidence relating to any attempt to destroy evidence of the Section 2339A offense.  *Id.* At the same time, while the specified offense is limited, Attachment B, which includes numerous broad categories of information, including a catch-all provision, without any search protocol, permits an unbridled search of the electronic media devices.  *Id.*  Consequently, the execution of the Electronic Devices Warrant resulted in recovering items wholly unrelated to the specified offense of providing material support or resources in furtherance of a crime of terrorism, including the draft letter from Pugh to his wife and forensic evidence of intentional destruction of data.  *See supra* at Statement of Facts § III.A.

Accordingly, the warrant is facially overbroad and thus violates the Fourth Amendment. *See Galpin*, 720 F.3d at 448 (holding that a warrant was facially overbroad where the offense specified in the warrant was a failure for a sex offender to register his online identity, the search of the hard drive at issue provided virtually no limits on the items to be seized, thus calling into question whether child pornography yielded from the search should be suppressed).  In these circumstances, the Second Circuit requires further analysis: first, whether the warrant is

22

severable, "*i.e.*, whether it is possible to carve out the portions of the warrant authorizing a search for [providing material support for a crime of terrorism] from the constitutionally infirm remainder"; and, if so, whether the evidence unrelated to the Section 2339A offense "was in plain view when it was seized." *Galpin*, 720 F.3d at 448.

Here, while an argument can be made that many of the categories listed in Attachment B might yield evidence of providing material support for a crime of terrorism, they are so broad that without any search protocols designed to limit the search in any way, the plain view exception does not save materials such as Pugh's draft letter to his wife from suppression. *See id.* at 451 ("[T]he district court's review of the plain view issue should take into account the degree, if any, to which digital search protocols target information outside the scope of the valid portion of the warrant. To the extent such methods are used, the plain view exception is not available."); *United States v. Cioffi*, 668 F.Supp. 2d 385, 392 (E.D.N.Y. 2009) ("[W]hatever new challenges computer searches pose in terms of particularity, it is always necessary—and hardly onerous—to confine *any* search to evidence of particular crimes") (emphasis in original).

Finally, the good faith exception does not apply here because it is so facially deficient "that the executing officers [could not] reasonably presume it to be valid." *Groh v. Ramirez*, 540 U.S. 551, 557 (2004). Here, no reasonable officer could reasonable presume a warrant as valid, where the warrant: (i) identifies a single offense; (ii) permits law enforcement to conduct an unconstrained search of electronic media devices; and (iii) there are no protocols designed to limit the review of information outside the scope of the valid portions of the warrant. *See Galpin*, 720 F.3d at 453 (good faith exception likely not applicable where "there is ample evidence that investigators sought evidence beyond the scope of the one crime that was particularized in the warrant application and for which the application supplied probable cause");

*United States v. Zemlyansky*, 945 F.Supp. 2d 438, 466-467 (S.D.N.Y. 2013) (holding that good faith exception not applicable, where, as here, the infirm warrant suffered from both overbreadth and lack of particularity).  Furthermore, to the extent the search warrant application could have provided greater particularity than authorized on the face of the warrant—and that is not the case here in any event—the application can only be relied upon if it accompanies the warrant or is incorporated by reference therein.  *Groh v. Ramirez*, 540 U.S. 551, 557 (2004); *Cioffi*, 668 F.Supp. 2d at 394.  Here, the warrant application was not annexed to, or incorporated by reference in, the Electronic Devices Warrant.

Accordingly, under the circumstances, the government should itemize all materials recovered from the execution of the Electronic Devices Warrant for a determination as to which of those materials should be suppressed.

### B.  Any items obtained from the execution of the Backpack Warrant should be suppressed.

The January 21, 2015 warrant authorizing the seizure and search of Pugh's backpacks (the "Backpack Warrant") should be suppressed because the delay in the execution of the warrant rendered the information supporting the issuance of the warrant stale.  A warrant may lack probable cause "where the facts supporting criminal activity have grown stale by the time that the warrant issues."  *United States v. Raymonda*, 780 F.3d 105, 114 (2d Cir. 2015).  Indeed, "the facts in an affidavit supporting a search warrant must be sufficiently close in time to the . . . subsequent search conducted so that probable cause can be said to exist as of the time of the search and not simply as of some time in the past." *United States v. Wagner*, 988 F.2d 69, 75 (2d Cir. 1993).

Whatever evidence the government sought to find in the two backpacks was based on its speculative assumption that the backpacks contained the same items he had during his travel to

Turkey on June 10, his detention in Egypt from June 11 to June 14, and his arrival at the New York airport on June 15. *See supra* Statement of Facts § III.B. However, during that entire time period, the backpacks were not seized "to avoid arousing Pugh's suspicion that he was under investigation by U.S. authorities." (Creizman Decl. Ex. F ¶ 15). For that reason, rather than arresting him, the agents permitted Pugh to leave the airport with his backpacks, and then stay overnight at his father's house. Pugh was arrested the following day on June 16, and the agents were able to recover only one of the backpacks. The second backpack was recovered from Pugh's father on June 17.

In these circumstances, the information supporting that the backpacks would contain evidence of criminal activity lacked probable cause by the time Pugh was arrested. Indeed, Pugh could have disposed of or replaced the items in his backpacks from the time he left the airport until his arrest. For that matter, Pugh could have disposed of items in his backpacks during his trip from Egypt to New York, and anyone in Pugh's father's house with access to the second backpack could have removed or replaced the items in that backpack.

Accordingly, any items recovered from the execution of the Backpack Warrant should be suppressed.

### C. The Facebook Warrant lacks particularity and is overbroad.

The February 17, 2015 warrant authorizing the seizure and search of Pugh's Facebook account (the "Facebook Warrant") suffers from essentially the same constitutional deficiencies as the Electronic Devices Warrant. *First*, the Facebook Warrant is overbroad because many of the categories identified for seizure in the warrant application were not supported by probable cause. *See* Statement of Facts § III.C. Indeed, the affidavit in support of the Facebook Warrant essentially establishes that Pugh's Facebook account might be the repository of constitutionally-protected speech, but provides no basis for believing that it contains private communications

between Pugh and representatives of a foreign terrorist organization.  (Creizman Decl. Ex. H).

Here, at best, the probable cause determination consisted of little more than speculation and

conjecture.  *See Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) ("mere hunch" does not

create even reasonable suspicion, much less probable cause).

*Second*, the Search Warrant lacks particularity.  To the extent the Facebook Warrant

affidavit supplied probable cause to believe that Pugh committed the specified offense—

attempting to provide material support or resources to a foreign terrorist organization—the items

to be seized should have been limited to the items (a)-(c) in Attachment B(II):  (a)

communications and photographs concerning the use and procurement of explosive devices and

other weapons; (b) communications and photographs concerning the transportation, safe-housing

and activities of terrorist operatives; and (c) communications concerning terrorist financing, the

location of terrorist groups, and/or methods of traveling to join designated foreign terrorist

organizations.  (Creizman Decl. Ex. H).

The items to be seized, however, were not so limited, but rather were merely listed "by

way of example only."  Furthermore, there were no protocols designed to limit the scope or time

period of the search and review of Pugh's Facebook communications.  In effect, the Facebook

Warrant essentially permitted law enforcement to rummage wholesale through Pugh's Facebook

communications, trampling on Pugh's constitutional privacy interests that the Fourth

Amendment was intended to protect.  *See Coolidge*, 403 U.S. at 467.

*Third*, the Facebook Warrant authorizes a search that far exceeded its legitimate scope.

Under Attachment B(I), the government was permitted to obtain and search the entire contents of

Pugh's Facebook account, although the warrant authorized seizure of items only relevant to the

material support charges.  Here, most of the categories of data Facebook is required to provide to

the government were highly unlikely to yield evidence of terrorism-related communications or financing, such as all identity, profile, and contact information, all IP logs, all Facebook posts, all privacy and account settings, and all records of Facebook searches.  Any reliance by law enforcement on the Facebook Warrant, which incidentally did not attach or incorporate the warrant affidavit, was thus objectively unreasonable.

Accordingly, any evidence obtained from the execution of the Facebook Warrant that does not fall within categories (a)-(c) of Attachment B(II) should be suppressed.

**IV.   Pugh is entitled to a bill of particulars specifying the activities the government contends constitute the material support and resources Pugh attempted to provide.**

Pugh seeks an order requiring the government to particularize the nature of the activities the government contends constitute the "material support and resources" that he attempted to provide to ISIL.  *See United States v. Warsame*, 537 F.Supp. 2d 1005, 1010 (D. Minn. 2008) (ordering the prosecution to file a bill of particulars specifying the activities it contends constitute material support and resources).

A bill of particulars is warranted under Fed. R. Crim. P. 7(f) so that Pugh can adequately prepare his defense, avoid surprise at trial, and, if prosecuted a second time for the same offense, interpose a plea of double jeopardy.  *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).  The decision to grant a bill of particulars is committed to the broad discretion of the trial court.  *United States v. Tramunti*, 513 F.2d 1087, 1113-14 (2d. Cir. 1975).  Where, as here, the charges in the Indictment are "so general that they do not advise [Pugh] of the specific acts of which he is accused," a bill of particulars is warranted.  *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987).  Although the government may argue that Pugh does not need a bill of particulars because he knows what he did or did not too, Judge Weinfeld rejected that very proposition over 50 years ago:

27

> The fact that a defendant may have some, or even all the information requested, does not necessarily defeat his right to a bill of particulars.  The issue on a motion for a bill of particulars is what the *Government* intends to prove upon the trial in support of its charge.  The defendant is entitled to this information in order properly to prepare to meet the charges and to avoid surprise upon the trial.   The Government's position also disregards the fact that a defendant is presumed to be innocent and hence, that it must be assumed he is ignorant of the facts on which the pleader founds his charges.

*United States v. Spur Knitting Mills, Inc.*, 187 F. Supp. 653, 654 (S.D.N.Y. 1960) (citations and quotations omitted).

Although a bill of particulars is not a discovery tool designed to obtain disclosure of the government's evidence and theories, here, Pugh does not seek "a preview of the evidence or the theory of the government's case."  *United States v. Taylor*, 707 F. Supp. 696, 699 (S.D.N.Y. 1989) (citations omitted).  Rather, he merely requests that the government provide him with basic *facts* so that he may understand the nature of the charges against him voted on by the grand jury and adequately prepare for trial.  In any event, where, as here, if necessary to give the defendant enough information about the charge to prepare his defense, a bill of particulars "will be required even if the effect is disclosure of evidence or of theories."  *United States v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1998).

Here, the government has premised its prosecution on the theory that Pugh was attempting to provide material support to ISIL in the form of "personnel," specifically, himself.  As the Supreme Court held in *HLN*, Section 2339B "makes clear that 'personnel' does not cover independent advocacy.  'Individuals who act entirely independently of the foreign terrorist organization to advance its goals and objectives shall not be considered to be working under the foreign terrorist organization's direction and control.'"  *Id.* at 23.  Here, the government should be required to specify what activities Pugh intended and attempted to do "under [ISIL's]

direction or control or to organize, manage, supervise, or otherwise direct the operation of

[ISIL]." 18 U.S.C. § 2339(h).

## V. The government should be directed immediately to produce *Brady/Giglio* Material.

The government has a constitutional duty to disclose evidence favorable to an accused

when such evidence is material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83 (1963).

This duty includes disclosure of information that could be used to impeach a government

witness. *Giglio v. United States*, 405 U.S. 150 (1972). "A prudent prosecutor will be quick to

disclose any information that tends to exculpate the defendant. As the representative of the

Government, the prosecutor's task is not to win a case, but to see that justice is done." *United*

*States v. Frank*, 11 F. Supp. 2d 322, 327 (S.D.N.Y. 1998). "[G]enerous disclosure of

information helpful to the defendant will increase confidence in the outcome of trial." *Id.*

"Complying with the Jencks Act, of course, does not shield the government from its

independent obligation to timely produce exculpatory material under Brady—a constitutional

requirement that trumps the statutory power of 18 U.S.C. § 3500" *United States v. Rittweger*, 524

F.3d 171, 181 n. 4 (2d Cir. 2008). This Circuit has interpreted *Brady* and *Giglio* to require the

earliest disclosure necessary for effective use by the defense, of "material, which if not disclosed,

creates a reasonable probability of altering the outcome" of trial. *United States v. Coppa*, 267

F.3d 132, 146 (2d Cir. 2001). Thus, the defense is entitled to immediate disclosure of

exculpatory or impeachment material where later disclosure would deprive the defense of its

effective use at trial. *Id.* at 146. Courts have discretion to fashion an order to disclose *Brady* and

*Giglio* material "as a matter of case management." 267 F. 3d at 146.

Pugh seeks immediate disclosure of all *Brady* and *Giglio* material in its possession,

custody, and control, including impeachment material, so that the defense can conduct

appropriate investigation and analysis for effective use both at any suppression hearing and at

trial.  *Brady* disclosures are especially salient here, where there is the potential that critical elements of the government's case against Pugh rest on the word of cooperating witnesses, and where many other relevant facts are exclusively in the government's possession.

In this case, exculpatory material under *Brady* would include, but is not limited to, interview memos, excerpts from interview memos, witness statements (whether oral or reduced to writing), agents' reports of investigation, documents, records, recordings, email exchanges, and forensic analyses that are wholly or partially inconsistent with the following claims:

- That Pugh agreed to provide any material support and resources to ISIL, in particular material support in the form of personnel.

- That Pugh knew that ISIL was a designated terrorist organization.

- That Pugh knew that ISIL was engaged in or engaging in terrorist activity and terrorism.

- That Pugh was acting, attempted to act, or intended to act under the direction or control of ISIL, or to direct ISIL's activities.

## VI.   The government should be ordered to provide early disclosure of 404(b) evidence.

The Court should order early disclosure of any evidence of other crimes, wrongs, or acts that the government might seek to introduce pursuant to Federal Rule of Evidence 404(b).  Rule 404(b) itself contemplates such disclosure: "upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial . . . of the general nature of any such evidence it intends to introduce at trial."  Fed. R. Evid. 404(b).  Early disclosure will enable defense counsel to prepare motions *in limine* as appropriate and facilitate an orderly trial.  *See id.*, Advisory Committee Notes to 1991 Amendment (explaining that "pretrial notice requirement in criminal cases [] is intended to reduce surprise and promote early resolution on the issue of admissibility").

Here, the Complaint and the search warrant affidavits refer to unidentified sources who informed law enforcement of Pugh's supposed interest in supporting pro-radical Islamic groups and purported expression of anti-American sentiment.  To the extent the government intends to introduce more detail and context concerning these statements as other act evidence at trial, Pugh should be apprised of this information as soon as practicable so that he can adequately prepare for trial and potentially challenge its admissibility at trial.

Accordingly, the Court should order the government to disclose any evidence of other crimes, wrongs, or acts that it might seek to introduce as soon as possible, but no later than thirty days before trial.  *See United States v. Vilar*, 530 F. Supp. 2d 616, 640 (S.D.N.Y. 2008); *Stein*, 424 F. Supp. 2d, at 727-28; *United States v. Santiago*, 174 F. Supp. 2d 16, 41 (S.D.N.Y. 2001); *United States v. Grasso*, 118 F. Supp. 2d 322, 329-30 (E.D.N.Y. 2000).

## CONCLUSION

For the foregoing reasons, Tairod Pugh respectfully requests that this Court enter an order: (1) dismissing Count One of the Indictment; (2) dismissing Count Two of the Indictment; (3) suppressing evidence obtained from the execution of the search warrants issued in this case; (4) directing the government to provide Pugh with a bill of particulars; (5) directing the government to provide immediate disclosure of *Brady* and *Giglio* material; (6) directing the government to provide early disclosure of other act evidence under Fed. R. Evid. 404(b).


Dated:  October 22, 2015
         New York, New York


Respectfully submitted,

/s/ Eric M. Creizman
Eric M. Creizman
CREIZMAN LLC
565 Fifth Avenue
New York, NY 10017
Tel. (212) 972-0200
Fax (646) 200-5022
ecreiz@creizmanll.com

*Attorneys for the Defendant,*
*Tairod Nathan Webster Pugh*