SDD:SPN/TAD/MEB
F. # 2015R00079

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -                                    Docket No.   15-CR-116 (NGG)

TAIROD NATHAN WEBSTER PUGH,

              Defendant.

– – – – – – – – – – – – – – – – – – – –X

GOVERNMENT'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENANT'S MOTION IN LIMINE
TO PRECLUDE EVIDENCE AT TRIAL

                                      ROBERT L. CAPERS
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201

Samuel P. Nitze
Tiana A. Demas
Mark E. Bini
Assistant U.S. Attorneys
    (Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to the defendant's Motion In Limine To Preclude the Admission at Trial Of a Draft Letter to His Spouse, dated January 11, 2016 (Docket Entry No. 62) (the "defendant's motion" or "Def.'s Mot."). The defendant's motion consists of two parts. First, the defendant argues that a draft letter to his wife (the "draft letter") that was recovered from his laptop following his arrest is a privileged marital communication and, therefore, inadmissible at trial. Second, the defendant argues that videos depicting violence and promoting the designated foreign terrorist organization known as ISIL that were recovered from his laptop should be precluded as irrelevant and unduly prejudicial. For the reasons set forth below, the defendant's motion should be denied in its entirety.

STATEMENT OF FACTS

The government respectfully incorporates by reference the statement of facts set forth in its Memorandum of Law In Support of Motion In Limine to Admit Certain Evidence Against Defendant, dated January 11, 2016 (Docket Entry No. 61) (the "government's motion in limine" or "Govt. Mot."). The following additional facts are relevant to the Court's consideration of the defendant's motion.

Documents obtained during the course of the government's investigation indicate that the defendant first met his wife, identified in the defendant's motion as "M.H.S," an Egyptian citizen, just twelve days before the defendant and M.H.S. underwent a religious marriage ceremony. (See Exhibit 1, attached hereto, at 1.) The religious ceremony appears to have occurred on or about April 17, 2014. (Id. at 2-3.) In order for a non-Egyptian man to legally marry an Egyptian woman of the Islamic faith, the couple must also

2

be civilly married before a Egyptian Notary Public.  Before the civil marriage can take place, the couple must provide: (1) a notarized, sworn statement that the non-Egyptian man is free to marry; (2) proof of citizenship or a valid passport; (3) a certified statement from Al Azhar (the religious authority in Egypt that handles conversions to Islam and issues certifications declaring that a person has become a Muslim) stating that the man is Muslim; and (4) health certificates stating that they do not carry any diseases.  In addition, if the non-Egyptian man lied to the wife about being divorced, the wife may divorce him.[1]

Communications between the defendant and M.H.S. show that the defendant spent the better part of April through June of 2014 attempting to obtain the necessary documents to legally marry M.H.S.  For example, a document titled "Certificate of Embracing Islam," dated April 27, 2014 was in the defendant's possession when he was arrested, as was an "Affidavit of Eligibility to Marry," dated April 30, 2014.  (See Exhibits 2 and 3, attached hereto.)  Records obtained from Facebook show that as of June 2014, the defendant still had not obtained all of the documents required to legally marry M.H.S.  (See Exhibit 1 at 4-8.)  On June 3, 2014, the defendant sent a Facebook message to an acquaintance asking her to "get certified copies of divorce and send them to me next day delivery."  (Id.)  These divorce papers related to the defendant's first marriage, to an American citizen named S.A; they were divorced on April 26, 2004.  (See Exhibit 4 (divorce decree).)  The defendant eventually obtained a certified copy of the divorce decree concerning his marriage to S.A.  (Id.)

---

[1]    The information in this paragraph regarding the steps required to marry in Egypt was obtained in consultation with an Egyptian law firm that sometimes handles marriage, divorce, and inheritance cases involving Egyptian nationals and foreigners.

The defendant appears to have married again after he divorced S.A.  In Facebook communications, the defendant repeatedly refers to a "2nd wife," with whom he lived in Johannesburg, South Africa, in or around and between 2010 and 2011.  (See Exhibit 1 at 10-12.)  Although the defendant at times refers to this woman as his "ex-wife," it is not clear that they ever divorced.

For most of their brief marriage, the defendant and M.H.S. lived in different countries.  From approximately April to August, 2014, the defendant lived in Dubai, United Arab Emirates, and M.H.S. lived in Aswan, Egypt.  (See Exhibit 1 at 1.)  The distance between these locations is approximately 1,920 miles by road, or a seven-hour flight.  Between August 2014 and late December 2014, the defendant lived in Kuwait City, Kuwait, and M.H.S. lived in Aswan, Egypt.  The distance between these locations is approximately 1,421 miles by road, or a six-hour flight.  The defendant speaks and reads English, while M.H.S. speaks and reads Egyptian Arabic.  (Id. at 56-57.)  To communicate with each other while separated, the defendant and M.H.S. predominantly used Facebook, a social media platform, to send messages to each another.  Due to their inability to speak or read a common language, the defendant and M.H.S. frequently enlisted the aid of friends, family, or strangers to translate each other's messages.  They also used Google translator to communicate in Arabic, which resulted in frequent misunderstandings and the need to enlist third parties to translate.

For example, during the conversation set forth below, which took place from May 21 to 22, 2014, the defendant and M.H.S. were unable to understand each other, resulting in the defendant stating that he needed to find an Arabic speaker to help him.  The

4

defendant then reached out to M.H.S.'s relative, Galal A., to understand what M.H.S. was

talking about:[2]

| | |
|---|---|
| **MHS:** | Greetings, I made an appointment at the Embassy.  Send Jalal the health certificate via *DHL (letters in English).* |
| **PUGH:** | I need an address. |
| **MHS:** | Okay.  How are you? |
| **PUGH:** | I am fine.  I will send the health certificate. |
| **MHS:** | There is something unclear in the language you talk to me. |
| **PUGH:** | It needs an address, as I will send a *DHL,* a *DHL* package. |
| **MHS:** | Wait, there are other reasons. |
| **. . .** | |
| **PUGH:** | [In English] *I need Mahmoud email address to send him the health certificate.* |
| **MHS:** | Umar,[3] talk to Jalal. |
| **PUGH:** | I am talking to Jalal and am tired of trying to get married. |
| **MHS:** | No, 'Umar, the Embassy. |
| **MHS:** | I will get my passport [IL].  Send me the documents as if I am a friend of yours. |
| **PUGH:** | Use different words, I do not understand.  You want me to send a memorandum inviting you and my fiancé to Dubai – at this time? |

---

[2]    Except where otherwise noted, the conversations set forth in this brief were translated from Arabic to English by certified Arabic interpreters.  The interpreters also provided the translations included in Exhibit 1.  The translations are not final, and as such, some words may change in the final version.  Misspellings and errors in syntax have been left as they appear in the quoted messages.

[3]    Umar (also spelled Omar) is the defendant's Islamic name.

> **MHS:** Send a visit [request] so you and I can complete the documents in Dubai.  It is better as a solution, -- because the American Embassy in Egypt—is trying to complicate matters.
>
> . . .
>
> **MHS:** What do you mean, O 'Umar, about the meaning of words?
>
> . . .
>
> **PUGH:** And you will find [someone who] speaks Arabic and sending for your mobile phone in three hours 0800 Egypt time.
>
> **PUGH:** [In English]  Translation are getting things confused.  I need to find Arabic speaker to ask questions.

(Exhibit 1 at 13-14.)

On May 21, 2015, the defendant communicated with Galal A., a relative of M.H.S., who attempted to convey M.H.S.'s message to the defendant in English.  (See Exhibit 1 at 24 (Galal A.: "[M.H.S.] asked you to send her a visit to Dubai.  [M.H.S.] want to go to dubai to you.  [M.H.S.] says you send visit to her and make proper marriage in Dubai."))  The following day, the defendant told Galal to "tell [M.H.S]" that he was "coming to Cairo" to "take care of paperwork."  (Id. at 26).

Days later, on May 26, 2014, the defendant and M.H.S. encountered similar difficulty communicating via Facebook using Google translator:

> **MHS:** Enough, 'Umar I cannot stand it, I cannot stand it, I cannot stand it.
>
> **PUGH:** I do not understand – cannot stand it, cannot stand it.
>
> **MHS:** I cannot
>
> **PUGH:** This word does not work on Google.

6

(Exhibit 1 at 27-28.)

On June 7, 2014, the defendant misunderstood M.H.S.'s request (in English) that he buy her "a dress" for a cousin's wedding. (See Exhibit 1 at 29-30.) The defendant responded, using Google translator: "My dear wife, the wedding dress is just for the bride. No, I will not buy a wedding dress but you will buy a new dress – for yourself in Cairo." (Id. at 37.) On the same date, the defendant sent a message to a friend, in English, stating that he was "trying to figure out why my wife wants me to buy a wedding dress for her to go to her niece wedding," noting "something is getting lost in translation." (Exhibit 1 at 60-68.)

To communicate anything of substance to M.H.S., the defendant typically sent a message in English to a third party and requested an Arabic translation, which he then sent to M.H.S. For example, on July 24, 2014, the defendant wrote a lengthy Facebook message intended for M.H.S. to Suofy A.,[4] asking her to "deliver a message for me" to M.H.S. (Id. at 38-41.)

On August 3, 2014, the defendant sent a message to M.H.S. in Arabic asking her to "use short Arabic sentences. Google doesn't translate Egyptian words. Use short sentences. I didn't understand what you said." (Id. at 42-43.)

Later that month, using Google translator, the defendant informed M.H.S that he had been fired from his job in Kuwait, (Id. at 44) and subsequently asked her: "Do you want to come with me to Syria, Iraq, Palestine?" (Id. at 45.) M.H.S. responded: "Grant me patience, oh God! Work is a component of worship, and you don't like to work!" The defendant responded: "The words are confusing, please answer with yes or no." (Id.)

---

[4]     Based on other Facebook communications, Suofy A. appears to be a friend or relative of M.H.S.

7

On August 18, 2014, the defendant sent the following Facebook message to

Suofy A., in English:

> Asalaamu alaikum.  I am having problems communicating with [M.H.S.]  This past Ramadan i saw the photos of the dead Muslims in Palestine and I cried a lot.  I am tired of being a sheep in Islam when I want to be a Lion for Islam.  There is so many Ayats in Quran about making Hijr to Muslim Lands, I want to be like the sahaba and fight for this deen.  I want Allah to tell me [Surah al-Fajr] welcome to my heaven.
>
> Does [M.H.S.] want a divorce?  I don't know what she wants, she will not answer [yes] or no questions.  google translator is making things worse.
>
> I am not happy being a Muslim I want to be a believer.  I want to follow Quran and Sunnah.  I can not sit by and the unbelievers kill us any more.  I want to be a brick in building the Islamic State.
>
> I want to go higher in Jenna and I want my wife by my side.  All she has to do is be patient, I will deal with the heat, I will deal with the bombs, and the dead bodies, the fighter jets, and the enemy soldiers.  I will stay up at night in fear of the next day.  All she has to do is be patient.  I love my wife but I love Allah and the Prophet Mohammad more.
>
> Please explain this to her thank You.

(Id. at 39.)  The defendant then confirmed to Suofy A. that he "wanted to go to Palestine and

fight," and said he "want[ed] to spend time with my wife first."  (Id.)  Further Facebook

messages between the defendant and Suofy A. indicate that the defendant called Suofy on the

same date.  (Id. at 41.)  Suofy then informed the defendant "your wife she want see you

before you going to gehad she told me that."  (Id.)

On September 19 and 20, 2014, the defendant and M.H.S. exchanged the

following Facebook messages, in Arabic (except where otherwise noted):

8

**PUGH:** One day we will die.  I don't want to be a priority in your life.  The priority should be God and his Messenger and Islam.  I am not important.

**PUGH:** I won't pick up the phone

**MHS:** Omar, we don't understand each other, please let's end everything between you and me.

**MHS:** Please, life with you is becoming impossible.  Please send it to me! [divorce paper]

**MHS:** You are creating a problem in my life, and I am not creating any problem in yours. We don't understand each other. Divorce me without letting anyone know.  It should stay between the two of us. I will go back to live on my father's pension. God will assist me

**PUGH:** [In English] a couple of weeks ago I expressed a desire to go "fi si bililah"[5] you responded with the desire "to kill yourself"

. . .

Misha this life is short we are all going to die. Today tomorrow, next week or 10 years from now.  It is already written.  We can not delay or push forward the day Allah claims our souls. I am going to die, I am going to die, I am going to die.  4 months 10 days later you will be free to marry.

The only thing we can count on is Allah and the Sunnah of Prophet Mohammed.

. . .

I love you I truly love you I want to spend eternity with you in Jenna.[6] But you belong to Allah. Because you are

---

[5] Based on consultation with a certified Arabic interpreter, the phrase "fi sabililah" translates to "in the cause of Allah," or "for the sake of Allah."

[6] Based on consultation with a certified Arabic interpreter, the word "Jenna" or "Jennah" translates to "Paradise."

> his soul I will do everything I can to get you the best in this world and the next.
>
> I am your husband but I belong to Allah. You cannot stop me from seeking my creator. We are Muslims I am striving to be in the company of the Prophets, the righteous, the Martyrs. I am striving for the highest heavens. There is only one thing that gives me pleasure in this earth and that is you. Allah and his Messenger comes first.

**MHS:** Omar, please divorce me and I will live on my father's pension. It's unfair that you push a person to be a burden on others. You want to go to jihad, even if your wife doesn't agree. You are not going to heaven, and I have rights, so please, before you go to jihad, give me my right [divorce me]. I won't forgive you as long as I live. This is betrayal. Please 'Omar divorce me without anybody knows about it, please, life is becoming impossible, please, I won't forgive, please 'Omar, please 'Omar, please 'Omar.

. . .

**PUGH:** If you want divorce, I won't prevent you, and I won't help you.

(See Exhibit 1 at 46-49).

On September 21, 2014, the defendant sent M.H.S.'s Arabic response ("Omar, please divorce me and I will live on my father's pension . . .") to an acquaintance, Mohammed G., and asked: "what does she say. I don't trust Adil to translate." (Exhibit 1 at 51). Later that same day, the defendant sent a lengthy message (in English) intended for M.H.S. to Mohamed G., asking him to "translate this please." (Exhibit 1 at TP 51-52). The defendant wrote, in relevant part:

> I am tired of fighting you about what is my rights. I am tired of fighting you about what Allahs right on me are. Leave the marriage on your own. You accept all responsibility including the financial. If you do not want me, then leave. You want a divorce because I believe in the

10

> promise of Allah. Leave Misha. Leave Misha. Leave Misha. You do not want my Jenna I will not give you any of my Dunya.[7] I am on a mission for the pleasure of Allah. I delayed for 2 years because of your selfish behavior. I will not allow you or anyone to get in my way.

(Exhibit 1 at 54-55.) Later that day, the Mohamed G. provided the requested Arabic translation, explaining "it takes time from me to get all the meaning." (Id. at 53.) Less than an hour later, the defendant sent the translated message to M.H.S. (Exhibit 1 at 54).

On September 21, 2014, M.H.S responded, in Arabic: "Peace be upon you, 'Omar, I won't talk again about jihad or divorce or Khula (right of a woman to seek divorce). Do whatever you want, I am not selfish. In the beginning of marriage we agreed not to divorce and we agreed you don't talk about jihad." (Exhibit 1 at 55).

On December 7, 2014, the defendant sent a message to another Facebook user whom he recently had "friended," stating:

> asalaam wa alaikum. I need some arabic speaking sisters to befriend my wife. Her name [M.H.S.]. She does not speak english. So if you know sisters out there it would be appreciated. I don't require communication betweeen y'all videos and quran from the dawla[8] point of view and from the womans perspective would be helpful

(Exhibit 1 at 56). Later the same day, the defendant sent the following message to the same Facebook user:

> peculiar situaton-Idon't speak arabic, she don't speak english. I have trying to get her to emigrate to "you know where". i is difficult to make a strong argument.Sooo I need a little help from the Muslimahs who

---

[7]    Based on consultation with a certified Arabic interpreter, the word "Dunya" translates to "earthly world" and often refers to "earthly," i.e., material possessions.

[8]    Based on consultations with an Arabic interpreter and documents and videos uncovered during this investigation, "dawla" is part of the Arabic term for ISIL and is often used as a reference to the group.

can pass along the positive messages of dawla and there videos. to counter the negative publicity in the news. Does that make sense

(Exhibit 1 at 57).

The Facebook user responded: "I wouldn't have a clue, I'm not into that stuff." (Id.).

After their September 21, 2015 conversation where they agreed not to discuss divorce or jihad, the defendant and M.H.S. generally avoided those topics, with one notable exception. On December 21, 2014, the defendant and his wife exchanged the following Facebook messages, in Arabic, using Google translator:

| | |
|---|---|
| **MHS:** | Your life is full of problems and sadness that's not reasonable. |
| **PUGH:** | This is not our life. Our life is in Paradise. You must not be distracted with wealth, family, child and jobs. We must keep our concentration on seeking our home in heaven. Success in the Quran and Sunnah. Most Muslims don't know and she doesn't want to know. I want Paradise and I want you to be my wife in Paradise. I love you and I want what's best for you. |
| **MHS:** | I don't want to take anything away from you. Life with you is difficult. I don't agree in anything with you. You make me hate marital life. |
| **MHS:** | I hate earthly life. I hate life. I wish death at any second. |

(Exhibit 1 at 58-59.)

The defendant and M.H.S communicated via Facebook until January 6, 2015. They continued to misunderstand each other when relying on Google translator. The messages they sent each other in Arabic generally did not exceed two lines of text. In addition, they continued to rely on third parties to translate each other's messages.

12

The draft letter, which was recovered from the defendant's laptop pursuant to a lawfully obtained search warrant, states, in full:

My Misha

The day of Quiyama is 50,000 years long; we will be raised from our graves naked to stand before Allah and judged.  If our scales are light it will be the Hellfire and if our scales are heavy we will attain eternal happiness. There will be a group who Allah will raise from the grave but this group will not be naked nor will they have fear. They are the Shaheed.

On that day men will run from their wives and children.  Everybody will only be concerned with themselves for fear of Allah's wrath.  Look for me babe on that day.  I will seek the permission of Allah to go to you with the most beautiful garment you would have ever seen, touched, and smelled.  I will cover my wife and escort you to a place reserved for us.  We will sit in comfort; we will be served wine by beautiful youths.  I will escort you into Paradise and when you see the home paid for by my blood and your tears you will know it was all worth it.

Read the Quran and believe in it.  It is not a story book.  It is the words of Allah to each and every one of us.  Muslims read the Quran but they don't really believe.  They don't believe in the promises of Allah. I BELIEVE, I BELIEVE.  I defied my friends and family to become a Muslim, now I will defy Muslims to be a Mujahid.

I am a Mujahid.  I am a sword against the oppressor and a shield for the oppressed. I will use the talents and skills given to me by Allah to establish and defend the Islamic State.  There is only 2 possible outcomes for me.  Victory or Martyr.  If Allah gives us Victory we will have a home in Al-sham.  I will send for you when it is safe.  You will have a nice home around believers.  If I am made a martyr we will have a mansion of indescribable beauty on a magnificent plot of land.  The land under a whip is worth more than the world and all it contains.

I calculated my worth in Dunya.  I would usually sell myself for $1,000 dollars a week, that would be ½ a million dollars for 10 years.  If I sell myself to Allah: 1 night guarding the borders for the sake of Allah is worth more than the world and all it contains.

The document properties of this letter show a creation date of January 3, 2015 and a last modified date of January 5, 2015.

As discussed below, the defendant's motion in limine to preclude the draft letter fails on the facts set forth above. The government is prepared to supplement the factual record with additional communications as warranted.

ARGUMENT

I.     The Draft Letter Is Not Covered By The Marital Communications Privilege

A.  The Marital Communications Privilege

In a criminal trial, the availability of any privilege is "governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed. R. Evid. 501. The marital communications privilege protects private communications between spouses. Wolfle v. United States, 291 U.S. 7, 14 (1934). Courts have generally held that the privilege: (1) extends to words and acts intended to be a communication; (2) requires a valid marriage; and (3) applies only to confidential communications. See In re Witness before Grand Jury, 791 F.2d 234, 237 (2d Cir.1986); In re Reserve Fund Sec. & Derivative Litig., 275 F.R.D. 154, 157 (S.D.N.Y. 2011). "The party asserting an evidentiary privilege, such as the marital communications privilege, bears the burden of establishing all essential elements." United States v. Acker, 52 F. 3d 509, 514-15 (4th Cir. 1995) (quoting United States v. White, 950 F. 2d 426, 430 (7th Cir. 1992)); In re Reserve Fund Sec. & Derivative Litig., 275 F.R.D. at 158. The marital communications privilege "can be successfully asserted only when there exists a marriage valid at the time the communication is made," and it is the defendant's burden to establish

14

the existence of a valid marriage if he wishes to assert the privilege. In re Witness Before Grand Jury, 791 F.2d at 237.

Because the marital communications privilege impedes the search for truth, it is to be narrowly construed. See Trammel v. United States, 445 U.S. 40, 50 (1980); United States v. Estes, 793 F.2d 465, 468 (2d Cir. 1986) (observing that testimonial privileges "must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth" (internal quotation marks omitted)); see also United States v. Vo, 413 F.3d 1010, 1016 (9th Cir. 2005) ("We construe the marital communications privilege narrowly, to promote marriage without thwarting the administration of justice."); United States v. Frank, 869 F.2d 1177, 1179 (8th Cir. 1989) ("We recognize that privileges are disfavored because they impede the search for truth").

B. The Defendant Has Not Met His Burden To Establish The Essential Elements of the Marital Communications Privilege

The defendant's motion to preclude the draft letter, and other communications to his wife, on the ground that they are protected by the marital communications privilege should be denied because he has failed to establish the essential elements of the privilege.

First, the defendant has not established that his marriage to M.H.S., even if valid under Egyptian law, would be recognized in the United States. See United States v. Lustig, 555 F.2d 737, 748 (9th Cir. 1977) (noting that the marital privilege depends on the existence of a valid marriage, as determined by state law). Under U.S. law, a marriage recognized as valid in the country where it is consummated is valid in the United States so

15

long as the marriage does not violate any applicable law in the relevant state—such as polygamy laws.  See Bronislawa K. v. Tadeusz K., 393 N.Y.S. 2d 534, 535 (N.Y. Fam. Ct. 1977) ("It has been held that when this state is called upon to recognize either an incestuous or bigamous marriage, it will assert its strong public policy of condemnation thereof and refuse recognition even if that marriage was valid where consummated") (citing Matter of May's Estate, 305 N.Y. 486 (N.Y. 1953)).  The defendant was previously married twice: first to the American citizen S.A., from whom he was subsequently divorced, and later to a woman in South Africa.  When the defendant sought authorization to marry M.H.S. in Egypt, he does not appear to have obtained or submitted a certified divorce decree concerning his marriage to his South African wife to Egyptian authorities.  It is therefore unclear whether the defendant's marriage to M.H.S. is valid under U.S. law.

Second, although the defendant asserts in his motion that "the letter was plainly intended to be a confidential communication to [his] wife," Def. Mot. at 3, he has not established that a draft letter saved on his laptop constitutes a marital communication, or how or when he intended to send the letter to his wife.  See United States v. Mohsen, 587 F.3d 1028, 1033 (9th Cir. 2009) (affirming district court ruling that marital communications privilege did not apply to letter found in defendant's jail cell, where the letter had defendant's wife's name at the top and no mailing address, and noting that the defendant had presented "no evidence whatsoever" that he intended to deliver the messages to his wife).[9]

---

[9]     It is the government's view that the defendant intended to send the draft letter to his wife once he arrived in Syria.  In addition, due to the complexity of the letter, the significance of the message it sought to convey, and the fact that it was written in English, it is clear that the defendant intended it to be shared with third parties for translation and therefore did not intend it to be a confidential communication, as discussed further below.

16

In any event, assuming arguendo that (1) the defendant was lawfully married to M.H.S., (2) his marriage would be recognized in the United States, and (3) the draft letter constituted a marital communication that the defendant intended to send to his wife, his motion fails for the reasons set forth below.

C. The Defendant's and His Wife Were Effectively Separated When the Defendant Left Egypt To Fight Jihad In Syria

The marital communications privilege does not apply to the draft letter because the defendant's marriage to M.H.S. was moribund at the time he departed Egypt for Syria, and would have been destroyed had the defendant sent the draft letter.

Courts have consistently held that "only communications that take place during a valid marriage between couples still cohabiting pursuant to that marriage are protected by the privilege." United States v. Byrd, 750 F.2d 585, 593 (7th Cir. 1984). This is because "society has little interest in protecting the confidentiality of separated couples whose marriage has failed by the time of the communication. The need for truth outweighs this interest." United States v. Roberson, 859 F.2d 1376, 1378-82 (9th Cir.1988); see also United States v. Byrd, 750 F.2d at 594 (holding that "society's interest in protecting the confidentiality of the relationships of permanently separated spouses is outweighed by the need to secure evidence in the search for truth that is the essence of a criminal trial, and that proof of permanent separated status at the time of the communication between the defendant and the defendant's spouse renders the communications privilege automatically inapplicable"); In re Witness Before Grand Jury, 791 F.2d 234, 237-38 (2d Cir. 1986) ("Because the purpose of [the testimonial] privilege is to protect vital marriages from the possible harmful effect of compelled testimony, the privilege logically has no relevance to

17

marriages that are over or damaged beyond repair."); United States v. Murphy, 65 F.3d 758, 761-62 (9th Cir.1995); United States v. Jackson, 939 F.2d 625, 626 (8th Cir.1991).

While the "duration of the couple's physical estrangement" is an important factor in determining whether spouses have been permanently separated, "either party may bring forward special circumstances that render more or less likely the objective possibility of reconciliation at the time of the communications[] upon which the couple may have relied." In re Witness Before Grand Jury, 791 F.2d at 238. Such special circumstances are present here, not least because the defendant's marriage to M.H.S., to the extent it was lawful, was built on the shakiest of foundations. The defendant and his wife married before they knew each other, lived thousands of miles apart for all but a handful of brief visits during the course of the entire marriage, and were unable to communicate in the same language.

In addition, M.H.S. made clear that she had no interest in joining the defendant overseas on a journey to fight jihad. Indeed, in September 2014, after the defendant indicated he wanted to become a martyr, M.H.S. repeatedly requested a divorce from the defendant, stating in part, "I won't forgive you as long as I live. This is betrayal. Please 'Omar divorce me without anybody knows about it, please, life is becoming impossible, please, I won't forgive, please 'Omar, please 'Omar, please 'Omar." (See Exhibit 1 at 48). The couple reconciled only after M.H.S. noted that the couple had agreed not to discuss jihad. (Exhibit 1 at 55). When the defendant again raised the prospect of becoming a martyr in a message to M.H.S. on December 21, 2014, M.H.S. responded in part, "I don't agree in anything with you. You make me hate marital life. . . . I hate earthly life. I hate life. I wish death at any second." (Exhibit 1 at 58-59). Thus, taken in context, the draft letter makes

18

clear that when the defendant left Egypt to "use the talents and skills given to [him] by Allah to establish and defend the Islamic State," he was, in effect, leaving M.H.S. for good.  The defendant stated in the draft letter that the only outcomes left to him were to die a martyr or, in the event he successfully defended the Islamic State, to send for his wife.  Based on M.H.S.'s repeated insistence that she wished to divorce the defendant – even to die – before following him to wage jihad, it is clear that M.H.S. and the defendant would not have been reunited had he succeeded in his attempt to join ISIL and sent the draft letter.

D.  The Draft Letter Was Not a Confidential Communication

Even if the Court were to hold that the defendant was lawfully married to M.H.S., and that the marriage remained vital up until the time of the defendant's arrest, the marital communications privilege would not apply to the draft letter because the letter was not intended to be confidential.

It is well settled that in order for the marital communications privilege to protect a communication, that communication must be confidential.  In re Witness Before Grand Jury, 791 F.2d at 239.  Thus, "wherever a communication, because of its nature or the circumstance under which it was made, was obviously not intended to be confidential, it is not a privileged communication."  Wolfle v. United States, 291 U.S. 7, 14 (1934); see also In re Witness Before Grand Jury, 791 F.2d at 239 ("Although 'communications' between spouses are presumed to be confidential, this presumption is rebutted when the communicant knew that the information was or would be disclosed to third parties or to the public."); United States v. Marashi, 913 F.2d 724, 730 (9th Cir. 1990) (holding that the "privilege applies only to those marital communications which are confidential.  That is, the privilege does not extend to statements which are made before, or likely to be overheard by, third

19

parties." In Re The Reserve Fund Sec. & Derivative Litig., 275 F.R.D. 154, 159, 164 (S.D.N.Y. 2011) (holding that marital communications privilege did not apply to emails sent by employee to wife over company e-mail server). Where courts have concluded that a party should have expected that his or her communication was not private, they have rejected the invocation of the marital communications privilege with respect to that communication. See, e.g., United States v. Madoch, 149 F.3d 596, 602 (7th Cir. 1998) (rejecting invocation of marital communications privilege because communications from jail are likely to be monitored by prison authorities and overheard by others); United States v. Harrelson, 754 F.2d 1153, 1169-70 (5th Cir. 1985) (no marital communications privilege during prison visit where eavesdropping could reasonably be expected to occur).

In Wolfle, 291 U.S. at 16-17, the Supreme Court held that a husband's letter to his wife was not protected by the marital communications privilege because it had been dictated to stenographer. In the district court below, the stenographer to whom the letter had been dictated testified at trial based on her notes concerning the content of the letter. The letter in Wolfle, like the draft letter here, "was a relevant admission by petitioner, probative of his guilty purpose or intent to commit the crime charged." Id. at 13. In determining that the contents of the letter were not privileged, the Court noted that the question was not "one of fact whether the [defendant's] letter to his wife was intended to be confidential," as it could be assumed that "communications between husband and wife may sometimes be made in confidence even though in the presence of a third person." Id. at 15. Rather, the question was "the extent to which the privilege which the law concedes to communications made confidentially between the husband and wife embraces the transmission of them, likewise in confidence, through a third party intermediary, communications with whom are not

themselves protected by any privilege." Id.  The Court distinguished the marital

communications privilege from the doctor-patient privilege (where the presence of a nurse

does not vitiate the privilege) and the attorney-client privilege (where the presence of a

lawyer's clerk does not vitiate the privilege), and held that the marital communication

privilege did not apply when the communication was transmitted through a third party

stenographer.  Id. at 16-17.  See also Periera v. United States, 347 U.S. 1 (1954) (affirming

admission of defendant's statements to his then-wife, which were made in the presence of

third parties).

Here, because the defendant and M.H.S. did not speak the same language, and

based on their history of using third-party intermediaries to translate important

communications, it is clear that, to the extent the defendant intended to send the draft letter to

M.H.S., he also intended to disclose it to a third party to have it translated or expected that

M.H.S. would disclose it for translation.  This is particularly so given the life-changing

significance of the communication coupled with the defendant's history of requesting third

parties to translate far less significant messages.  While the defendant and M.H.S. at times

relied on Google translator, this method of communication frequently failed, as detailed

supra.  Furthermore, whenever the defendant sought to convey a lengthy or important

message, he generally sent the English version of the message to a third party and obtained a

translation before sending the message to M.H.S.  (See, e.g., Exhibit 1 at 22-26 (message

from defendant on May 2014 instructing  Galal A. to tell M.H.S. that the defendant was

"coming to Cairo" to "take care of paperwork."))  In addition, the defendant's Facebook

communications with M.H.S. reveal that the was aware that M.H.S. often consulted with a

21

third party to translate his messages, such as when she told the defendant to "talk to Jalal." (Id. at 18.)

The defendant repeatedly sought translation assistance when conveying his desire to fight jihad to M.H.S.  Notably, on December 7, 2014, the defendant wrote a pair of messages to a Facebook user seeking help communicating the defendant's desire to travel to Syria.  In the first message, he wrote in part, "I need some arabic speaking sisters to befriend my wife.  Her name [M.H.S.]. She does not speak english. So if you know sisters out there it would be appreciated."  (Id. at 56.)  He followed with a message stating, "[P]eculiar situaton- Idon't speak arabic, she don't speak english. I have trying to get her to emigrate to 'you know where'. i is difficult to make a strong argument.Sooo I need a little help from the Muslimahs who can pass along the positive messages of dawla and there videos. to counter the negative publicity in the news. Does that make sense[?]"  (Id. at 57.)  The references to "you know where" and "dawla" along with dawla's "videos" and "negative publicity in the news" strongly suggest that the defendant was seeking help persuading M.H.S. to emigrate with him to Syria.  If the defendant needed assistance presenting his view of ISIL to his wife, surely he or M.H.S. would have sought third-party translation for the draft letter, which contained five paragraphs and more than 400 words, in English, describing in detail the defendant's plan to defend the Islamic State and possibly die a martyr.

22

In sum, the draft letter is not protected by the marital communications privilege because the defendant would have sent it to a third party to be translated into Arabic or expected that M.H.S. would arrange for its translation.[10]

II.   The Videos and Other Terrorist Propaganda Videos Possessed or Accessed by the Defendant Are Admissible at Trial

The defendant moves to exclude from evidence "videos depicting violent acts of terrorism or other highly prejudicial videos" on the theory that the probative value of the videos would be substantially outweighed by the danger of unfair prejudice. The defendant's argument is unavailing, for the reasons discussed at length in the government's motion in limine.

In support of his argument, the defendant relies exclusively on United States v. Al-Moayad, 545 F.3d 139 (2d Cir. 2007), but Al-Moayad is readily distinguishable. In Al-Moayad, the defendants were charged with and convicted of conspiring to provide material support to Hamas and al-Qaeda and attempting to provide material support to Hamas. Al-Moayad, the head of a charitable organization, and his co-defendant were arrested following a sting operation in which the defendants accepted money from a confidential informant. In its case in chief, the government introduced in-depth testimony from an individual named Gideon Black who witnessed a suicide bombing of a passenger bus in Tel Aviv. The sole connection between the suicide bombing and the defendants was that a guest at a wedding hosted by Al Moayad had made a speech the same day as the bombing referencing a "Hamas's operation in Tel Aviv." Id. at 147. The district court allowed Black to testify "at

---

[10]   The government notes that to the extent the defendant seeks to preclude other communications between Pugh and M.H.S. that were communicated to a third party, the same analysis applies.

23

length and in considerable detail about the bombing, and his testimony was a prominent feature of the government's case." Id. at 147.  The government also introduced into evidence photographs of the mangled bus and news reports about the bus bombing for the purpose of proving that Hamas engaged in terrorist activity, although the defendant had offered to stipulate to that fact. Id. at 152.  The Second Circuit found that the admission of Black's testimony, in conjunction with testimony by a rebuttal witness about an al-Qaeda training camp that neither defendant attended was error.  The Court concluded that while the district court had "considered" the probative value and possible prejudicial effect of Black's testimony, the court's decision was arbitrary. Id. at 160.

Here, by stark contrast, the government proposes to play a limited selection of videos out of more than 100 recovered from the defendant's laptop, and to excerpt the videos to avoid exposing the jury to the most brutally violent scenes, such as those depicting the beheading of ISIL captives.  Moreover, unlike the challenged testimony in Al-Moayad, the relevance of the videos extends far beyond the defendant's knowledge of ISIL's terrorist acts.  As discussed in detail in the government's motion in limine, the videos and other materials recovered from the defendant's laptop are probative of, among other things, the defendant's motive and intent to join ISIL when he left Egypt to travel to Syria, and of his intent to obstruct an official proceeding when he destroyed the thumb drives in his possession when he was stopped at the Turkish border.  As such, the videos constitute direct evidence of the charged offenses, and also are admissible as "other act" evidence to prove preparation, plan, knowledge, motive, and intent.

24

CONCLUSION

For the foregoing reasons, the defendant's motion should be denied.

Dated:     Brooklyn, New York
           January 20, 2016

                                    ROBERT L. CAPERS
                                    United States Attorney
                                    Eastern District of New York
                                    271 Cadman Plaza East
                                    Brooklyn, New York 11201


                          By:    /s/
                                 Samuel P. Nitze
                                 Tiana A. Demas
                                 Mark E. Bini
                                 Assistant United States Attorneys
                                 (718) 254-7000

25