# CREIZMAN LLC

565 Fifth Avenue
7th Floor
New York, New York 10017
tel: (212) 972-0200
fax: (646) 200-5022
ecreiz@creizmanllc.com
www.creizmanllc.com

*By ECF*

January 27, 2016

The Honorable Nicholas G. Garaufis
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**Re:  *United States v. Tairod Pugh*, 15-CR-116 (NGG)**

Dear Judge Garaufis:

We respectfully submit this letter brief on behalf of Tairod Pugh in further support of his motion *in limine*, dated January 11, 2016, to preclude admission of a draft letter to his wife under the marital communications privilege.  In this regard, we also move to preclude the Facebook messenger communications exchanged between Pugh and his wife that the government described in its opposition papers.  The marital communications privilege also applies to those communications.

In its memorandum of law, the government erroneously argues that Pugh has not met his burden to establish the elements of the marital communications privilege. The government contends that:  (1) Pugh and M.H.S. were not lawfully married; (2) their marriage would not be recognized in the United States; (3) the draft letter he worked on between January 3 and 5 did not constitute a marital communication; (4) Pugh and M.H.S. were "effectively separated" when Pugh left Egypt on January 10, 2015; and (5) the draft letter was not a confidential communication.  The government is wrong on each of those contentions

*First*, the documentary evidence clearly establishes that Pugh and M.H.S. were legally married in Egypt.  A religious ceremony was performed in Aswan, Egypt on or about April 17, 2014.  As the government points out in its memorandum of law, notwithstanding the religious ceremony, the marriage was not valid under Egyptian law until a civil marriage was effected before an Egyptian Notary Public. (Dkt. 68 at 2-3).  But Pugh and M.H.S. satisfied that requirement.  Egyptian law required that Pugh and M.H.S. produce to the Notary Public certain documentation, including the couple's respective passports, a "Certificate of Embracing Islam,"

NEW  YORK    WHITE  PLAINS

Hon. Nicholas G. Garaufis
January 27, 2016
Page 2

an "Affidavit of Eligibility to Marry," and the divorce decree from his first marriage in the United States. (*Id.* at 3). And, as they were required to do, in early June 2014, Pugh and M.H.S. obtained the required documents,[1] were married before an Egyptian Notary Public,[2] and were issued a certificate of marriage.[3] Accordingly, there can be no legitimate dispute that their marriage is valid under Egyptian law.[4]

*Second*, Pugh's marriage to M.H.S. is also valid under U.S. law. Under the principle of comity, courts in the United States will recognize a foreign marriage as valid if it is valid under the laws of country in which it was contracted. *See Ponorovskaya v. Stecklow*, 987 N.Y.S.2d 543, 548-49 (Sup. Ct. 2014) ("The general rule is that the validity of a marriage is determined by the law of the place where it is contracted. Thus, a marriage which is valid under the law of the state or country in which it is contracted will generally be recognized as valid. ") (*quoting* 52 Am.Jur.2d Marriage § 65). As described above, Pugh and M.H.S.'s marriage is valid under Egyptian law. Accordingly, it is also valid under U.S. law.

The government argues, however, that the marriage is against public policy in the United States, based on its unfounded speculation that Pugh is a bigamist. The government relies on references in Pugh's Facebook messages to a second "ex-wife." But the government ignores the very records it seized from Pugh that demonstrate that this second marriage ended in divorce. As set forth in Pugh's passport application, on or about December 19, 2005, Pugh married a South African citizen, F.B., in Johannesburg. They were divorced on or about June 1, 2007. *See* Ex. B at TP000003829 (defendant's passport application). In the face of evidence that Pugh and F.B. are legally divorced, the government has failed to present any evidence that Pugh and F.B. are still married. In addition, we expect to establish conclusively that to the extent Pugh was lawfully married in South Africa to F.B., he also obtained a lawful divorce. We are currently working with South African counsel to locate any official records of the marriage and o the divorce.[5]

---

[1] *See* Dkt. 68, Exs. 2, 3, 4.

[2] *See* Exhibit A (photos of civil wedding ceremony).

[3] *See* Dkt. 62, Ex. A (official marriage documents).

[4] The government suggests that M.H.S. may, hypothetically, have a "right to divorce" the defendant if it were found that he lied to her about being divorced. *See* Dkt. 68 at 3. The government has presented no evidence, however, indicating that Pugh lied. On the contrary, the only evidence is his sworn affidavit in support of his eligibility to marry stating that his prior marital status was "divorced," a fact that is also supported by his passport application. *See* Exhibit B at TP000003829

[5] We understand that Pugh and F.B. were married in Muslim ceremony, and are investigating whether any civil record of their marriage exists in South Africa that would demonstrate they entered into a marriage legally recognized by South Africa. Significantly, if their marriage was invalid under South African law, it would also be invalid here, thus vitiating the government's

Hon. Nicholas G. Garaufis
January 27, 2016
Page 3

*Third*, the draft letter is a marital communication.  It is no great stretch to infer that Pugh intended to deliver it in the same way as hundreds, if not thousands, of his other communications with his wife:  via Facebook messenger.  For example, on January 5, 2015, he wrote M.H.S. a lengthy message on Facebook that concerns may of the same issues addressed in the draft letter.  In that instance, Pugh expressed the message to his wife in both English and Arabic, the latter by means of Google translate.[6]  The English portion of that message stated, in part:

> peace be upon you.
>
> … I read quran, and hadith. I pray and I fast. I am a Muslim striving to be Mujahid, there is no zina[7] and I love my wife.
>
> I will purchase a plane ticket tomorrow for Turkey. God willing I will leave Saturday, I will start work next week.
>
> The job in Dubai and Kuwait was out of my control. Can you imagine how much I was hated. I did not drink alcohol with them, I did not get prostitutes with them, I did out go smoke with them. They came into my room and threw Alcohol in my face during the month of ramadhan and in kuwait they lied cheated and stole. They did not honor 1 thing in the contract.
>
> Every thing is in Allah hand. our food, where we sleep, when and where we die is all up to Allah. It was written in a book long before the earth was created.

Thus, notwithstanding the government's cherry-picked communications, a more fulsome review of the couple's communications demonstrates that Pugh was fully capable of delivering lengthy, complicated messages via Facebook and Google Translate (even if he risked losing some of the sense of his original message).

The government wishes to have it both ways by arguing, on the one hand, that it was intended to be a marital communication but the privilege would have been vitiated because Pugh

---

argument that Pugh's civil marriage to M.H.S. in Egypt was void *ab initio* because he did not obtain a divorce from F.B.  *See, e.g., Ponorovskaya,* 987 N.Y.S.2d at 549 ("If a marriage is invalid under the law of the place where contracted, it will generally be invalid wherever the question of its validity may arise.); *Bronislawa K. v. Tadeusz K.*, 393 N.Y.S.2d 534, 535 (Fam. Ct. 1977) (holding that Communist Poland's refusal to recognize religious marriages is not against New York's public policy).

[6] Defense counsel has consulted with a fluent Arabic speaker in connection with the Arabic portions of Pugh' and M.H.S.'s communications referenced in this letter.

[7] The Arabic word "zina" means sex between unmarried people.  Pugh is apparently referring to an argument between himself and M.H.S. about whether he flirted with a female relative of hers whom he calls Maya.

Hon. Nicholas G. Garaufis
January 27, 2016
Page 4

would have needed a translator, and on the other, that he never actually intended to send the letter, so it is not a marital communication.  *See* Dkt. 68 at 19.  But, in fact, either way, the government comes up short.  Indeed, assuming that Pugh did *not* intend to deliver the letter, then it should be excluded under Rule 403.  Although a draft letter that Pugh never intended to actually send might have some probative value as to his state of mind, the fact that Pugh didn't send it, or intend to, would signify that the letter amounted to nothing more than inchoate musings.  In these circumstances, the limited probative value of the draft letter as to Pugh's state of mind would be far outweighed by the undue prejudice stemming from his referring to himself as a Mujahid, a Martyr, and a defender of the Islamic State.

*Fourth*, contrary to the prosecution's value judgments as to strength of their relationship, the evidence, in full context, demonstrates that Pugh and M.H.S. still had a viable marriage when he left Egypt for Turkey.  Indeed, by focusing solely on the couple's disagreements, the government has created a one-sided portrayal of their marriage.  The messages between them are those of a husband and wife living apart, and coping with a long-distance relationship made more difficult because of their difficulty understanding each other's native language.  In their messages from December 2014, *after* the fight described in the government's memorandum of law (*see* Dkt. 68 at 12), their communications are sometimes flirtatious and at other times reflect frustration as they try to work through language difficulties, the logistics of travelling to see one another and economic concerns.  During this time they frequently refer to one another as "baby," transliterated into Arabic.  They both express concern for one another.  M.H.S. repeatedly asks after Pugh's health, and he asks her how she is sleeping.  They call each other by pet names.  They fight, as married couples do, and then they make up.  On January 6, 2015, M.H.S. writes two messages to Pugh.  The first says, "Baby, you're the best man I've seen in my life.  You're a good man, faithful and pure.  May God preserve you, baby."  The second says, "Umar, I love you, I love you, I love you.  I took the medicine.  Thanks be to God, I'm not in pain anymore.  Baby, baby, I love you."  *See* Exhibit C (draft translation of Facebook messages between Pugh and M.H.S. between December 23, 2014 and February 2, 2015).

Concededly, while not all is smooth sailing between them, to deem their marriage "moribund" would require a subjective judgment about the strength of the bond between spouses who cohabitated until the day of the husband's arrest in Turkey.  The Second Circuit has acknowledged that it would be "burdensome" for a district court to inquire into the nature of the relationship between spouses that "still regularly or occasionally cohabitate," as in this case.  *In re Witness Before Grand Jury*, 791 F.2d at 238 n.2.  *See also United States v. Roberson*, 859 F.2d 1376, 1380 (9th Cir. 1988) ("We decline to frame a categorical rule governing the application of the marital privilege to failing marriages.  Yet, a totally unrestricted approach may involve district judges in difficult and sometimes inappropriate inquiries…. We follow an approach similar to that adopted by the Second Circuit.  The district court must first find that the husband and wife have been separated at the time of the communication.") (citations omitted).  There certainly was no legal separation at the time, which would have been objective proof of a moribund marriage.  Moreover, Pugh's communications to M.H.S. reflect his desire to bring her to live with him if he found a job in Turkey.  In short, their marriage was, and is, very much alive.

The government nevertheless argues that "special circumstances" are present here which

Hon. Nicholas G. Garaufis
January 27, 2016
Page 5

"render more or less likely the objective possibility of reconciliation at the time of the communications." Dkt. 68 at 18. This argument puts the cart before the horse. There is no possibility of "reconciliation" for the Court to consider because there was no separation or estrangement, physical or otherwise, preceding it. And the fact is that, even now, M.H.S. continues to express concern about her husband's welfare, in spite of the charges against him, which the government well knows because it monitors his communications at the MDC. The government's hypothetical that Pugh's alleged attempt to join ISIS would spell an immediate end to his marriage thus fails under its own theory and collapses of its own weight.

*Fifth*, the government has not overcome the presumption that the letter was confidential. The Supreme Court has stated that where a third party's "participation in the confidence is reasonably required" the policy of the marital privilege will "find a way to make that protection effective" by bringing that third party within its scope. *Wolfle v. United States*, 291 U.S. 7, 16 (1934). In *Wolfle*, a husband dictated a letter for his wife to a stenographer who transcribed it. The court noted that "communications between husband and wife may sometimes be made in confidence even though in the presence of a third person." *Id.* at 15. Although the court considered the duties performed by a private secretary or stenographer to be confidential, it held that the stenographer may testify concerning the substance of the dictated letter. *See id.* at 17. That is because "[n]ormally husband and wife may conveniently communicate without stenographic aid." *Id.* at 16. The court stated that because the marital communications privilege "suppresses relevant testimony, [it] should be allowed only when it is plain that marital confidence *cannot otherwise reasonably be preserved.*" *Id.* at 17.

Here, Pugh and M.H.S. were in the unusual situation of sometimes needing the assistance of third parties to communicate with each other because of the language barrier between them. The policy of the marital privilege is to promote frank and open conversation between spouses, which is "the best solace of human existence," *Trammel v. United States*, 445 U.S. 40, 51 (1980). *See also Roberson*, 859 F.2d at 1380 ("The marital privilege exists to insure that spouses generally feel free to communicate their deepest feelings to each other without fear of eventual exposure in a court of law."). Pugh and M.H.S. could not "communicate their deepest feelings" without the assistance of another person who knew both of their languages. To the extent that a third party was required to facilitate their marital communications, the third party should be brought within the scope of the privilege. Otherwise, Pugh and M.H.S. could not enjoy the full benefits of their married status. Similarly, translators are supplied by the Eastern District every day to facilitate communications between foreign clients and their appointed counsel. All of those communications maintain the attorney-client privilege because the translator is required to enable the client to obtain legal advice from the attorney. There is no reason why the same principle should not apply to the marital communications privilege.

Accordingly, the assistance of a translator – which is hypothetical in the case of the draft letter in question – does not here render their communications non-confidential, and thus the privilege was maintained.

Hon. Nicholas G. Garaufis
January 27, 2016
Page 6

For the foregoing reasons and those stated in the defendant's original memorandum of law, we respectfully request that the Court preclude the government from introducing into evidence at trial all marital communications between Pugh and M.H.S., including the draft letter found on Pugh's laptop, as well as the Facebook messages the government describes in its opposition brief.

Respectfully submitted,

/s/ Eric M. Creizman
Eric M. Creizman
Zachary S. Taylor
Melissa Madrigal

cc:    Samuel Nitze, Esq., Tiana Dimas, Esq., and Mark Bini, Esq. (by ECF and email)
       Assistant United States Attorneys